Slip Op. 11-143

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**PEER BEARING COMPANY-CHANGSHAN**,

                Plaintiff,

                v.

**UNITED STATES**,

                Defendant, and

**THE TIMKEN COMPANY**,

                Defendant-Intervenor.

</td><td>

Before: Timothy C. Stanceu, Judge

Consol. Court No. 10-00013

</td></tr>
</table>

## OPINION AND ORDER

[Remanding to the U.S. Department of Commerce the final results of an administrative review of an antidumping duty order on tapered roller bearings and parts thereof from the People's Republic of China]

Dated: November 21, 2011

*John M. Gurley* and *Diana Dimitriuc Quaia*, Arent Fox LLP, of Washington, DC, argued for plaintiff. With them on the brief was *Matthew L. Kanna*.

*L. Misha Preheim*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Joanna V. Theiss*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*William A. Fennell* and *Nazakhtar Nikakhtar*, Stewart and Stewart, of Washington, DC, argued for defendant-intervenor. With them on the brief was *Terence P. Stewart*.

Stanceu, Judge: In this consolidated case, plaintiffs Peer Bearing Company - Changshan

("CPZ") and The Timken Company ("Timken"), challenge the final determination ("Final

Results") that the U.S. Department of Commerce ("Commerce" or the "Department") issued in

the twenty-first review of the antidumping duty order pertaining to imports of tapered roller

bearings ("TRBs") and parts thereof, finished and unfinished, from the People's Republic of

China (the "subject merchandise"). *Tapered Roller Bearings & Parts Thereof, Finished &*

*Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Admin. Review*

*of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Jan. 6, 2010) ("*Final Results*"). Compl.

(Jan. 20, 2010), ECF No. 2 ("CPZ's Compl."); Compl. (Mar. 5, 2010), ECF No. 11 (Court. No.

10-00045) ("Timken's Compl."). The twenty-first review pertained to entries of subject

merchandise made during the period June 1, 2007 through May 31, 2008 ("period of review" or

"POR"). *Final Results*, 75 Fed. Reg. at 845. CPZ, a respondent in the review, brings three

claims: (1) that "Commerce's decision to treat certain bearings further manufactured in a third

country as covered by the antidumping order for purposes of the Final Results is not in

accordance with law," CPZ's Compl. ¶ 30; (2) that "Commerce improperly issued an assessment

rate that results in a significant over-statement of the antidumping duties owed," *id.* ¶ 33; and

(3) that "Commerce valued CPZ's inputs of steel bar using aberrational price data that should be

rejected," *id.* ¶ 35. Timken, a domestic producer of tapered roller bearings that participated in

the proceedings before Commerce, claims that Commerce, in determining a surrogate value for

steel wire rod, a material used in producing CPZ's subject merchandise, "acted contrary to its

statutory obligation to value factors based on the most accurate information available . . . ."

Timken's Compl. ¶ 13.

Before the court are the motions filed by CPZ and Timken for judgment on the agency

record pursuant to USCIT Rule 56.2. Pl.'s Rule 56.2 Mot. for J. upon the Agency R. (Aug. 13,

2010), ECF No. 34; Pl.'s Rule 56.2 Mot. for J. upon the Agency R. (Aug. 16, 2010), ECF

No. 38.  The court determines that CPZ is entitled to a remand on the claim challenging the

Department's country-of-origin determination and the claim challenging the Department's

valuation of steel bar, but not on the claim challenging the assessment rate.  The court also

orders Commerce to reconsider and redetermine the surrogate value for steel wire rod, in

response to Timken's claim that the surrogate value was contrary to law and in response to a

request for a voluntary remand on this claim that defendant filed following oral argument.  Def.'s

Mot. for Voluntary Remand (June 15, 2011), ECF No. 88 ("Def.'s Remand Mot.").

## I. BACKGROUND

The Department initiated the twenty-first review on July 30, 2008.  *Initiation of*

*Antidumping & Countervailing Duty Admin. Reviews, Request for Revocation In Part, &*

*Deferral of Admin. Reviews*, 73 Fed. Reg. 44,220 (July 30, 2008).  On July 8, 2009, Commerce

issued the preliminary results of the review, which assigned CPZ a margin of 32.02%.  *Tapered*

*Roller Bearings & Parts Thereof, Finished or Unfinished, from the People's Republic of China:*

*Prelim. Results of the 2007-2008 Admin. Review of the Antidumping Duty Order*, 74 Fed. Reg.

32,539, 32,544 (July 8, 2009) ("*Prelim. Results*").  On January 6, 2010, Commerce issued the

Final Results, which assigned CPZ a margin of 24.62%.  *Final Results*, 75 Fed. Reg. at 845.

CPZ filed its complaint on January 20, 2010 and Timken filed its complaint on March 5,

2010.  CPZ's Compl.; Timken's Compl.  The court consolidated the two actions on May 24,

2010.  Order (May 24, 2010), ECF No. 27.  CPZ and Timken filed memoranda in support of

their motions for judgment on the agency record on August 16, 2010.  Pl.'s Mem. of Points &

Authorities in Supp. of its Mot. for J. on the Agency R. (Aug. 16, 2010), ECF No. 37 ("CPZ's

Mem."); The Timken Co.'s Mem. of Points & Authorities in Supp. of its Mot. for J. on the

Agency R. (Aug. 16, 2010), ECF No. 38 ("Timken's Mem.").  CPZ and Timken responded as

defendant-intervenors on November 22 and 23, 2010, respectively.  Peer Bearing Co.-

Changshan's Resp. in Opp'n to Timken's Rule 56.2 Br. in Supp. of Mot. for J. on the Agency R.

(Nov. 22, 2010), ECF No. 55; Def.-intervenor The Timken Co.'s Opp'n to Mot. for J. on the

Agency R. of Pl. Peer Bearing Co.-Changshan (Nov. 23, 2010), ECF No. 56 ("Timken's Resp.").

CPZ also filed a notice of supplemental authority prior to oral argument to inform the court of a

recent decision of the Court of International Trade and of the results in the subsequent

administrative review.  Pl.'s Notice of Supplemental Authority (May 10, 2011), ECF No. 84

(citing *Calgon Carbon Corp. v. United States*, 35 CIT __, Slip Op. 11-21 (Feb. 17, 2011)).

Defendant initially opposed each claim in this action, Def.'s Opp'n to Pls.' Mots. for J. upon the

Agency R. (Nov. 22, 2010), ECF No. 53 ("Def's Opp'n"), but, after the court held oral argument

on May 19, 2011, requested a voluntary remand as to Timken's claim challenging the surrogate

value of steel rod, Def.'s Remand Mot.

At oral argument, the court granted permission to CPZ to file a supplemental submission

clarifying its position and summarizing the record evidence pertaining to the challenge to

Commerce's country-of-origin determination, which submission CPZ filed on June 20, 2011.

Peer Bearing Co.-Changshan's Supplemental Submission Regarding Country of Origin of

Further Manufactured Merchandise (June 20, 2011), ECF No. 89.  Both Timken and defendant

filed comments on CPZ's submission.  The Timken Co.'s Resp. to Peer Bearing

Co.-Changshan's Supplemental Submission Regarding Country of Origin of Further

Manufactured Merchandise (June 27, 2011), ECF No. 94; Def.'s Resp. to Peer Bearing

Co.-Changshan's Supplemental Submission (June 28, 2011), ECF No. 95.

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2006), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act" or the "Act"), 19 U.S.C. § 1516a (2006),

including an action contesting the final results of an administrative review that Commerce issues

under section 751 of the Tariff Act, 19 U.S.C. § 1675(a).  The court must hold unlawful any

finding, conclusion or determination not supported by substantial evidence on the record, or that

is otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

A.  Remand is Required on the Department's Determination of the Country of Origin of Certain
                Bearings Further Manufactured in Thailand

CPZ challenges the Department's determining certain bearings that underwent final

processing in Thailand to be within the scope of the antidumping duty order as products of

China.[1]  CPZ's Mem. 32-39.  The production in China consisted of "forging, turning, heat

treatment of cups and cones, and roller and cage production"; the processing in Thailand was

"finishing which consists of grinding and honing" and assembly of the components into finished

bearings.  Issues & Decision Mem., A-570-601, ARP 5-08, at 8 (Dec. 28, 2009) (Admin. R. Doc.

No. 5701) ("*Decision Mem.*").  Based on what it described as the "totality of the circumstances,"

Commerce concluded that the processing in Thailand did not "substantially transform" the

merchandise and that the finished bearings therefore were products of China for antidumping

purposes.  *Id.* at 11.

---

[1] Peer Bearing Company - Changshan ("CPZ") made the identity of the third country
public at oral argument.  Oral Tr. 4 (May 19, 2011), ECF No. 98.

In making its country-of-origin determination, Commerce relied on several findings, including that "the average unit cost of manufacturing in the PRC . . . represents a significant percent of total COM [*i.e.*, cost of manufacture] and that the third-country processor's costs as compared to each product's COM are not significant." *Id.* at 10. Commerce reasoned that "the finishing process performed in the third country did not move the product out of the scope or create a product of a new class or kind because TRBs and parts thereof, finished and unfinished, are considered the same 'class or kind' of merchandise in the antidumping order on TRBs." *Id.* at 7. Commerce found, specifically, that "the finishing process does not change the physical or chemical properties of the TRB, nor does it change the essential character of the TRB." *Id.* at 9. Commerce also mentioned as a factor in its decision the level of investment in Thailand but concluded that "we have insufficient information to determine whether this factor would preclude or sustain a finding of substantial transformation in this case." *Id.* at 11. Commerce also found that "unfinished and finished bearings are both intended for the same ultimate end-use." *Id.*

The court determines that remand is appropriate because Commerce based its country-of-origin determination in part on the above-mentioned finding that "the third-country processor's costs as compared to each product's COM are not significant." *Id.* at 10. This finding is not supported by substantial evidence on the record, which contains evidence that the processing costs in Thailand accounted for 42% of the total cost of manufacturing.[2] *Letter from CPZ to the Sec'y of Commerce* exhibit 11 (Aug. 12, 2009) (Admin. R. Doc. No. 5597) ("*CPZ's Case Br.*"). In arguing that the Department's origin determination should be upheld, defendant argues, *inter*

---

[2] CPZ made this percentage public at oral argument. Oral Tr. 70.

*alia*, that "Commerce did not establish a threshold over which it would consider the investment 'significant' . . . ." Def.'s Opp'n 38.  This argument does not resolve the problem that arose from the Department's basing its origin determination, in part, on a finding that is unsustainable under the substantial evidence standard of review.  While possessing significant discretion in making country-of-origin determinations, *see Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994), Commerce may not disregard record evidence that detracts significantly from, and appears to refute, one of the findings on which the Department relied.  On remand, Commerce must reconsider on the whole its determination of the country of origin of the bearings that underwent further processing in Thailand.  Commerce must ensure that its redetermination of the origin of these bearings is based on findings supported by substantial evidence on the record of this case.

### B.  Plaintiff is Not Entitled to Relief on its Challenge to the Assessment Rate Methodology

CPZ challenges the Department's method of assessing antidumping duties on the period-of-review entries[3] made by CPZ's affiliated importer and reseller, Peer Bearing Company ("Peer").  CPZ's Mem. 8-19.  Although acknowledging that the Department assessed the duties according to the normal method described in the Department's regulations, CPZ argues that, on the particular facts of this case, the normal method impermissibly resulted in a significant over-assessment of antidumping duties.  *Id.*  CPZ proposed an alternative method, which Commerce

---

[3] "Entry" refers to an importer's filing the necessary documents with U.S. Customs and Border Protection ("Customs") "to secure the release of imported merchandise from Customs custody . . . ."  19 C.F.R. § 141.0a(a) (2011).  The importer is required to declare the value of the merchandise, which is referred to as the "entered value," as well as make a cash deposit in the amount of estimated duties.

rejected during the administrative review in favor of its normal method.  *Decision Mem.* 28-29.

Before the court, CPZ again advocates use of its proposed alternative method.

        In section 751 of the Tariff Act, Congress directed Commerce to use the determination

reached in a periodic administrative review as "the basis for the assessment of . . . antidumping

duties on entries of merchandise covered by the determination . . . ."  19 U.S.C. § 1675(a)(2)(C).

Commerce determines dumping margins based on the examined sales, rather than the entries, of

subject merchandise that occurred during a period of review, and it is common for the examined

sales not to correspond precisely to the period-of-review entries of a particular importer.  *See*

*Koyo Seiko Co. v. United States*, 258 F.3d 1340, 1342 (Fed. Cir. 2001) ("Although the 'dumping

margin' is calculated on 'sales' during the review period, the duty is imposed upon 'entries,' *i.e.*,

imports during the review period.").  This situation occurred in the twenty-first review.

        As provided in a Department regulation, the Department "normally" will calculate a

single *ad valorem* assessment rate to be applied to the entered value of subject merchandise on

an importer's entries subject to a review.  19 C.F.R. § 351.212(b)(1) (2011).  The regulation

states that the Secretary "normally" will calculate this assessment rate by "dividing the dumping

margin found on the subject merchandise examined by the entered value of such merchandise for

normal customs duty purposes."[4]  *Id.*  The regulation is intended to avoid the administrative

---

        [4] 19 C.F.R. § 351.212(b)(1) (2011) provides that:
        If the Secretary has conducted a review of an antidumping order . . . the Secretary
        normally will calculate an assessment rate for each importer of subject merchandise
        covered by the review.  The Secretary normally will calculate the assessment rate by
        dividing the dumping margin found on the subject merchandise examined by the
        entered value of such merchandise for normal customs duty purposes.  The Secretary
        then will instruct the Customs Service to assess antidumping duties by applying the
        assessment rate to the entered value of the merchandise.

burdens, including the record-keeping burden on respondents, of linking period-of-review entries with the corresponding sales.  *See Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,316 (Feb. 27, 1996) ("*Proposed Regs.*") ("[S]uch a requirement would impose a burden on respondents that would be disproportionate to the minor gains in the precision of duty assessments, and simply would render an already complex process even more complex.").  The U.S. Court of Appeals for the Federal Circuit has held this "normal" method of assessing antidumping duties to be based on a permissible construction of the antidumping statute.  *Koyo Seiko*, 258 F.3d at 1348.  The regulation affords discretion to use other methods, and Commerce on occasion has done so.[5]  CPZ's claim is that Commerce acted contrary to law by declining to make an exception to the normal method when determining an assessment rate for the entries Peer made during the POR.  *See* CPZ's Mem. 12-19.  For the reasons discussed below, the court concludes that CPZ may not obtain relief on this claim.

In support of its claim, CPZ argues, first, that the normal method produced an "over-assessment" of antidumping duties that was "manifestly unfair," *id.* at 14, exceeding by nearly

---

[5] *Notice of Final Results of Antidumping Duty Admin. Review: Certain Softwood Lumber Products From Canada*, 70 Fed. Reg. 73,437 (Dec. 12, 2005) and Issues & Decision Mem., A-122-838, ARP 4-04, at 11-12 (Dec. 12, 2005) (modifying an assessment rate for certain non-examined importers, which were not subject to a companion countervailing duty ("CVD") order, when the assessment rate was based on the dumping margins of examined importers subject to the CVD order); *Notice of Final Results of Antidumping Duty Admin. Review: Carbon and Certain Alloy Steel Wire Rod From Mexico*, 71 Fed. Reg. 27,989 (May 15, 2006) and Issues & Decision Mem., A-201-830, ARP 09-04, at 19 (May 15, 2006) (applying a per-unit assessment rate when entered values were not on the record); *Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Admin. Review*, 70 Fed. Reg. 34,082 (June 13, 2005) (applying per-unit assessment rate); *Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Admin. Review, and Final Partial Rescission of Antidumping Duty Admin. Review*, 67 Fed. Reg. 19,546 (Apr. 22, 2002) (applying per-unit assessment rate).

70% the aggregate amount of the individual dumping margins for the period-of-review sales,[6] *id.* exhibit 1. CPZ attributes this outcome to the special circumstances, in which "sales lagged entries" so that "the entered value in the sales database is substantially lower than actual entered value for the POR." *Id.* at 8. CPZ posits that this outcome could be avoided by use of the same numerator, but a different denominator, in the assessment rate calculation for Peer, stating that the only method of ensuring accuracy "is to calculate the assessment rate based on a denominator of *total POR entered value*" rather than a denominator of the entered value of the subject merchandise in the examined sales, which is a much smaller number. *Id.* at 13 & 2 ("On remand, Commerce should amend the assessment rate calculation by distributing the calculated amount of potentially uncollected antidumping duties ('PUDD') over the actual entered value of all of Peer's entries in the POR.").

        CPZ's proposed method of determining an assessment rate differs significantly from the normal method. Under the normal method, the amount of antidumping duty assessed on an entry made during the POR is neither the exact dumping margin for the sale of the merchandise on that entry nor an amount that is necessarily determined according to the aggregate dollar amount of the dumping margins on the sales corresponding to that importer's entries during the POR. Instead, the normal method calculates an assessment rate based on the total dumping margins in the examined sales, regardless of whether the entries corresponding to those sales occurred during the POR. The numerator and the denominator used to calculate the assessment rate are based on the same sales. That is not the case under CPZ's proposed method, by which the

---

[6] CPZ made this percentage public at oral argument. Oral Tr. 4.

aggregated dollar amount of the dumping margins determined for the examined *sales* occurring

during the POR would be spread over, and assessed upon, the *entries* occurring during the POR.

Under the normal method as established by the regulation, the starting point for the

Department's calculation of an assessment rate is "the dumping margin found on the subject

merchandise examined." 19 C.F.R. § 351.212(b)(1). Because the normal method does not

depend on a precise correspondence between an importer's POR entries and examined sales, the

"dumping margin found on the subject merchandise examined" will not necessarily represent the

total amount of antidumping duties that will be owed on all of the entries that an importer makes

during a period of review. That was the case here. Commerce calculated Peer's dumping

margins on a constructed export price ("CEP") basis, so the date of sale for purposes of

determining the U.S. price of the subject merchandise was the date the merchandise was first

sold to a party not affiliated with Peer or CPZ. CPZ's Mem. 8; 19 U.S.C. § 1677a(b).[7] Because

time lags occurred between the dates of Peer's entries and the dates of the sales to unaffiliated

parties of the subject merchandise on those entries, a significant number of Peer's entries during

the POR involved merchandise that, for antidumping purposes, did not undergo a "sale" during

the POR. Because it applied the normal method, the Department assessed duties based on the

aggregated margins, and entered values, for the examined sales on all of Peer's POR entries,

including those corresponding to merchandise not sold to unaffiliated parties during the POR.

---

[7] The statute, in 19 U.S.C. § 1677a(b), defines constructed export price as follows:
[T]he price at which the subject merchandise is first sold (or agreed to be sold) in the
United States before or after the date of importation by or for the account of the
producer or exporter of such merchandise or by a seller affiliated with the producer
or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted
under subsections (c) and (d) of this section.

CPZ mistakenly characterizes as an unfair "over-assessment" the result of the normal

method, which estimated dumping margins for the unsold merchandise.  The Department's

estimating these duties was in accordance with the policy underlying section 351.212(b)(1) of

the Department's regulations, under which Commerce estimated the margins for the unsold

merchandise using data on the administrative record pertaining to the examined sales.  The

record data did not allow Commerce to determine actual, as opposed to estimated, margins

(either individually or collectively) for the entries of unsold merchandise for a straightforward

reason: the merchandise was not sold to unaffiliated U.S. customers during the POR.  Margins

that could be determined when that merchandise eventually is sold to unaffiliated customers may

be more or less than the estimates, but the result of the normal method cannot fairly be

characterized as an "over-assessment."

CPZ's second argument is that it was unreasonable for Commerce not to use CPZ's

proposed method because record information allows for the assessment of the exact amount of

duties due and that Commerce should have used CPZ's proposed method in the interest of

attaining accuracy.  CPZ's Mem. 12.  CPZ asserts as facts that all of the sales in the twenty-first

POR correspond to entries that occurred during that POR, that the POR entered values in this

review are on the record, and that during the subsequent (twenty-second) period of review Peer

was acquired by SKF Group and stopped making any entries or sales of subject merchandise as

of the acquisition date.[8]  *Id.* at 17-18.  Citing the preliminary results in the subsequent (twenty-

second) review, CPZ also asserts that Peer had both sales and entries in the twenty-second

---

[8] CPZ states that the SKF Group acquired CPZ and Peer Bearing Company ("Peer") on
September 12, 2008.  Pl.'s Mem. of Points & Authorities in Supp. of its Mot. for J. on the
Agency R. 18 (Aug. 16, 2010), ECF No. 37 ("CPZ's Mem.").

review, which CPZ submits will allow Commerce to assess the full antidumping duties owing

due to merchandise not sold by Peer during the twenty-first POR. *Id.* at 17.

   In the Decision Memorandum, Commerce disagreed with one of CPZ's factual

assertions, concluding that "there is no conclusive evidence on the record of this review to show

that all of Peer's sales that occurred during the POR were entered during the POR." *Decision

Mem.* 29. The court need not resolve this factual dispute between the parties. Even when the

court presumes CPZ's assertion to be true, it still concludes that relief is not available on this

claim, which CPZ bases on the premise that "[r]ecord [i]nformation [a]llows for the [a]ssessment

of the [e]xact [a]mount of [d]uties [d]ue." CPZ's Mem. 12. The court agrees with this premise

only insofar as "the exact amount of duties due" is meant to refer to the duties that, in the

aggregate, are owing on those of Peer's twenty-first-review entries that correspond to the sales

occurring during the POR for the twenty-first review, all of which sales Commerce examined.

But, as the court observed above, data does not exist on the record by which the Department may

assess the exact (as opposed to estimated) amount of duties owing on Peer's entries of

merchandise that was not sold to unaffiliated U.S. customers during the twenty-first POR.

   CPZ bases its claim in part on an assertion that Peer will be assessed full and accurate

antidumping duties on the twenty-first-review entries of unsold merchandise as a result of the

twenty-second review, during which that merchandise, according to CPZ, would undergo sales

for antidumping law purposes that Commerce would examine in the twenty-second review. *Id.*

at 18. Commerce, of course, did not find that all of the unsold merchandise necessarily would be

sold in the next POR.[9] Granting relief on the claim would entail the court's concluding that

_____

   [9] To the contrary, the U.S. Department of Commerce ("Commerce" or the "Department")
(continued...)

Commerce was required by the circumstances of this case to reach such a finding and, based on that finding, to decide to depart from the normal method of 19 C.F.R. § 351.212(b)(1).  But consistent with the standard of review, the court could reach such a conclusion and order corresponding relief only if the Department's determination not to depart from the normal method was based on one or more findings unsupported by substantial evidence on the record of this case or was otherwise contrary to law.  19 U.S.C. § 1516a(b)(1)(B)(i).

        In supporting its claim, CPZ is unable to demonstrate that the Department's decision to apply the normal method depended on any specific findings of fact that were not supported by substantial evidence on the record of the twenty-first review.  CPZ asserts only generally, and unconvincingly, that the Department's assessment rate calculation for Peer is unsupported by substantial evidence.  CPZ's Mem. 8.  And in arguing that its assessment method would be more accurate than the Department's method, CPZ does not demonstrate that the estimates underlying the Department's assessment method were distorted, contrary to evidence of record in the twenty-first review, or otherwise impermissible under the statute or any applicable regulation.  In exercising the discretion inherent in 19 C.F.R. § 351.212(b)(1), Commerce, on the record facts of this case, was permitted to insist on assessing some antidumping duties, albeit duties based on estimated margins, on Peer's twenty-first-POR entries of subject merchandise that was not sold to unaffiliated purchasers, rather than rely on the subsequent review.  Thus, CPZ's claim reduces

---

        [9](...continued)
concluded that "there is no information on the record to indicate that all of Peer's POR entries will be sold by Peer in the subsequent review."  Issues & Decision Mem., A-570-601, ARP 5-08, at 29 (Dec. 28, 2009) (Admin. R. Doc. No. 5701) ("*Decision Mem.*").  CPZ relies for its argument on certain factual matters it considers uncontested, including statements by Commerce in the preliminary results of the twenty-second review, of which CPZ presumably would have the court take judicial notice.  CPZ's Mem. 18.

to an argument that Commerce acted contrary to law in failing to make a hypothetical finding

such as the court has identified and, on the basis of such a finding, depart from the normal

method in favor of one that would rely entirely on actual rather than estimated margins for those

entries.  Commerce was not required to find or presume that the "unsold" merchandise would

undergo a sale for antidumping law purposes during the twenty-second POR or that Peer would

be the party that sells it.  Without deciding whether Commerce permissibly could have acted as

CPZ now advocates, the court concludes based on the factual record of the twenty-first review,

the antidumping statute, and 19 C.F.R. § 351.212(b)(1) that CPZ is not entitled to a remand

under which Commerce would be directed to do so.  Such a remand order would be contrary to

the deference owed the Department under the standard of review.

        CPZ's remaining arguments also lack merit.  CPZ distinguishes on a factual basis cases

in which the Court of International Trade has upheld the Department's applying the normal

method.  CPZ's Mem. 14-17.  This argument does not overcome the weakness in CPZ's claim,

which is the inability to show that Commerce acted contrary to law in deciding to apply that

method on the evidentiary record of the twenty-first administrative review.  Finally, CPZ takes

issue with the Department's stating in the Decision Memorandum that "calculating assessment

rates by dividing total dumping duties by the total value of POR entries would complicate

continuity from one review period to another."  *Id.* at 17-18 (citing *Decision Mem.* 29).

Commerce based this statement on its observation that "there is no information on the record to

indicate that all of Peer's POR entries will be sold by Peer in the subsequent review."  *Decision*

*Mem*. 29.  As the court concluded above, Commerce was not required in the circumstances of

this case to reach a finding as to the eventual sale of the unsold merchandise.  Commerce was

permitted in these circumstances to apply the normal method defined by its regulation, regardless

of whether acceptance of the CPZ proposal for the twenty-first review assessment process might

be considered to "complicate continuity."[10]

C.  The Department's Choice of Surrogate Value for Bearing-Quality Steel Bar is Not Supported
by Substantial Evidence on the Record

Commerce based the surrogate value for one of CPZ's factors of production, bearing-

quality steel bar, on World Trade Atlas ("WTA") import data for Indian Harmonized Tariff

Schedule ("Indian HTS") subheading 7228.30.29,[11] which reflected an average unit value

---

[10] Had Commerce accepted as valid all of CPZ's assumptions as to the twenty-second
review and on that basis decided to adopt CPZ's proposed assessment method in the twenty-first
review, such a decision would have affected the choice of an assessment method for Peer's
entries occurring during the period of the twenty-second review, whether or not that decision
would be considered to have "complicated" the assessment process for the Peer entries across
both reviews.

[11] The Indian HTS provides, in pertinent part, for the following subheadings under
heading 7228 ("Other bars and rods of other alloy steel; angles, shapes and sections, of other
alloy steel; hollow drill bars and rods, of alloy or non-alloy steel"):
    7228.10 Bars and rods, of high speed steel:
    7228.20.00 Bars and rods, of silico-manganese steel
    7228.30 Other bars and rods, not further worked than hot-rolled, hot-drawn or extruded:
        7228.30.1 Bright bars:
        7228.30.2 Other:
            7228.30.21 Lead bearing steel
            7228.30.22 Spring steel
            7228.30.23 Sulphur bearing steel
            7228.30.24 Tool and die steel
            7228.30.29 Other
    7228.40 Other bars and rods, not further worked than forged:
    7228.50 Other bars and rods, not further worked than cold-formed or cold-finished:
    7228.60 Other bars and rods:
    7228.70 Angles, shapes and sections:
    7228.80 Hollow drill bars and rods:
Harmonized Tariff Schedule of India, *available at* http://www.customsinfo.com (last visited on
Nov. 21, 2011).

("AUV") of $1,889 per metric ton.[12]  CPZ's Mem. 25.  CPZ contests the Department's choice,

arguing that this choice reflects a value that is aberrationally high relative to certain "benchmark

data" that CPZ placed on the record during the review, which, according to CPZ, Commerce

impermissibly declined to consider.  *Id.* at 19.  The benchmark data included data from Infodrive

India ("Infodrive"),[13] which CPZ describes as demonstrating "that Indian HTS 7228.3[0]

contained large amounts of high-priced steel that clearly was not bearing quality steel."  *Id.*

at 24.  CPZ characterizes the AUV reflected by the Indian import data as more than 56% higher

than the weight-averaged value for bearing-quality steel imports in India, which according to

other Infodrive data are valued at $1,209.50 per metric ton.  *Id.* at 29.  CPZ also bases its claim

on import and export data pertaining to various other countries, including U.S. import data

specific to bearing-quality steel that show a value of $1,081 per metric ton.  *Id.* at 25; *Letter from*

*CPZ to the Sec'y of Commerce* exhibit 1 (Jan. 30, 2009) (Admin. R. Doc. No. 5489) ("*CPZ's*

*Jan. 30 Surrogate Value Submission*").  Further, CPZ points to data it submitted for the record

on the prices it paid for bearing-quality steel from suppliers in market economy countries, which

also were substantially lower than the Department's surrogate value.  CPZ's Mem. 25.[14]

---

[12] The surrogate value for bearing-quality steel bar differed slightly from the average unit value reflected by the Indian import data, as Commerce adjusted the value reflected by the import data using the price at which CPZ purchased a small quantity of this input from a market economy country. *Mem. from Int'l Trade Compliance Analyst to the File* 5 (June 30, 2009) (Admin. R. Doc. No. 5582).

[13] Infodrive India is a private entity located in India that provides data on imports and exports. *Letter from CPZ to the Sec'y of Commerce* exhibit 1 (July 28, 2009) (Admin. R. Doc. No. 5587) ("InfodriveIndia is a 12 year old market leader in providing Competitive Business Intelligence on Exports Imports.").

[14] In its notice of supplemental authority, plaintiff makes two additional arguments in support of this claim: (1) that the Department's disregarding the Infodrive India data in this

(continued...)

Subsection (1) of section 773(c) of the Tariff Act requires generally that when Commerce

determines the normal value of subject merchandise of a producer in a nonmarket economy

country, "the valuation of the factors of production shall be based on the *best available*

*information* regarding the values of such factors in a market economy country or countries

considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1) (emphasis

added).  Subsection (4) of section 773(c) instructs Commerce, in valuing factors of production,

to "utilize, to the extent possible, the prices or costs of factors of production in one or more

market economy countries that are–(A) at a level of economic development comparable to that

of the nonmarket economy country, and (B) significant producers of comparable merchandise."

*Id.* § 1677b(c)(4).  The question presented by CPZ's claim, therefore, is whether substantial

evidence on the record supported the Department's finding that Indian HTS data for subheading

7228.30.29 were the best available information to use as the principal basis for the valuation of

CPZ's bearing-quality steel bar input.

The record contained sets of WTA import data for Colombia, India, Indonesia, the

Philippines, and Thailand.  Commerce determined that each of these countries was at a level of

economic development comparable to that of China but that only two, India and Thailand,

"appear to be significant producers of comparable merchandise."  *Prelim. Results*, 74 Fed. Reg.

---

[14](...continued)
review is inconsistent with the Department's treatment of the Infodrive data in the subsequent
review, in which the Department, according to plaintiff, revised its surrogate value using
Infodrive data; and (2) that the Court of International Trade held the Department's disregarding
Infodrive data to be unlawful in a recent case and that the Infodrive data in this case apply to an
even larger percentage of covered imports.  Pl.'s Notice of Supplemental Authority (May 10,
2011), ECF No. 84 (citing *Calgon Carbon Corp. v. United States*, 35 CIT __, Slip Op. 11-21,
at 17 (Feb. 17, 2011) (finding unlawful the Department's disregarding Infodrive data covering
50% of imports)).

at 32,541; *see* 19 U.S.C. § 1677b(c)(4).  The record WTA import data for Thailand pertain to

Thailand's Harmonized Tariff Schedule ("Thai HTS") subheading 7228.30.90 and show an AUV

of $1,164 per metric ton.[15]  *CPZ's Jan. 30 Surrogate Value Submission* exhibit 3.  The record

WTA import data pertaining to Indonesian Harmonized Tariff Schedule ("Indonesian HTS")

subheading 7228.30 reveal an AUV of $1,038 per metric ton.  *Id.* exhibit 2.  The record WTA

import data pertaining to Filipino Harmonized Tariff Schedule ("Filipino HTS") subheading

7228.30 have an AUV of $870 per metric ton and the record WTA import data pertaining to

Colombian Harmonized Tariff Schedule subheading 7228.30 have an AUV of $1,005 per metric

ton.  *Letter from CPZ to the Sec'y of Commerce* exhibit 7 (July 28, 2009) (Admin. R. Doc.

No. 5587).

        In the Decision Memorandum, Commerce identified five criteria for selecting the "best

available information," stating that its "preference is to use, where possible, a range of publicly

available, non-export, tax-exclusive, and product-specific prices for the POR, with each of these

factors applied non-hierarchically to the particular case-specific facts and with preference to data

from a single surrogate country."  *Decision Mem.* 16-17.  Commerce explained its choice of the

Indian data by stating that "we continue to find that the WTA Indian import data under HTS

subheading 7228.30.29 are publicly available, broad market averages, contemporaneous with the

---

[15] The Thai HTS provides, in pertinent part, for the following subheadings under heading
7228 ("Other bars and rods of other alloy steel; angles, shapes and sections, of other alloy steel;
hollow drill bars and rods, of alloy or non-alloy steel"):
        7228.10 Bars and rods, of high speed steel:
        7228.20 Bars and rods, of silico-manganese steel:
        7228.30 Other bars and rods, not further worked than hot-rolled, hot-drawn or extruded:
                7228.30.10000 Of circular cross-section
                7228.30.90000 Other
Harmonized Tariff Schedule of Thailand, *available at* http://www.customsinfo.com (last visited
on Nov. 21, 2011).

POR, tax-exclusive, and representative of significant quantities of imports; thus satisfying

critical elements of the Department's SV [*i.e.*, surrogate value] test." *Id.* at 17.  Commerce

added that "because these data are from the primary surrogate country and representative of an

8-digit basket category, the most specific on the record to the input in question, we find that they

represent the best available information for purposes of valuing the steel bar input." *Id.*  The

Decision Memorandum thus indicates that Commerce chose the Indian HTS data over the Thai

HTS data, at least in part, because the Indian import data satisfied two of the Department's five

identified criteria that the Thai import data did not.  The Indian data, unlike the Thai data, were

from the "primary surrogate country."  *Id.* at 18; *see* 19 C.F.R. § 351.408(c)(2) ("[T]he Secretary

normally will value all factors in a single surrogate country.").  Commerce also applied its

specificity criterion, finding that the Indian import data represented by the $1,889-per-metric-ton

value were more "product specific" to the input than were the Thai import data.  *Decision*

*Mem.* 17.

        In addition, Commerce indicated that it chose the Indian import data over the Thai import

data because it concluded, based on its "benchmarking practices," that CPZ had not made a

"colorable claim" that the Indian import data were aberrational.  *Id.* at 18 ("CPZ did submit the

AUV for Thai import statistics under HTS subheading 7228.30.90 onto the record, which would

be an appropriate comparative price for the Indian SV data based on the Department's

benchmarking practices, had CPZ presented a 'colorable claim' that the Indian data are

aberrational.").

        On the topic of the Department's "benchmarking practices," the Decision Memorandum

explained that "Department practice has found that the existence of higher prices alone does not

necessarily indicate that price data is distorted or misrepresented, and thus, is not sufficient to

exclude a particular SV, absent specific evidence the value is otherwise aberrational." *Id.*

Commerce then concluded that because it determined that "CPZ has failed to demonstrate the

Indian data to be unreliable, we do not find it necessary [to] compare the Indian SV data to any

potentially appropriate benchmarks submitted to the record." *Id*. Commerce proceeded to

discredit the various items of benchmarking data CPZ had submitted.

Commerce first explained that, consistent with its "practice and policy," it would give no

weight to the Infodrive data. Commerce outlined its practice and policy as follows:

> The Department has stated that it will consider Infodrive data to further evaluate
> import data, provided: 1) there is direct and substantial evidence from Infodrive
> reflecting the imports from a particular country; 2) a significant portion of the overall
> imports under the relevant HTS category is represented by the Infodrive India data;
> 3) distortions of the AUV in question can be demonstrated by the Infodrive data; but
> that the Department will not use Infodrive data when it does not account for a
> significant portion of the imports which fall under a particular HTS subheading.

*Id.* at 18-19 (footnotes omitted). With respect to point two and the last point, Commerce

mentioned that "[a] comparative analysis of the Infodrive and the WTA data for Indian imports

under HTS subcategory 7228.30.29 shows that only 79.81 percent of the total WTA quantity for

all countries that the Department includes in its surrogate value calculations is accounted for in

the total quantifiable weight figures from the corresponding Infodrive data." *Id.* at 19. The

Decision Memorandum does not shed light on why a percentage of 79.81% did not, in the

Department's view, comprise "a significant portion" of the imports which fall under a "relevant"

or "particular" HTS "category" or "subheading." The Department mentioned, however, that in

comparing the two data sources it found a number of "variances" in country-specific data, which

it described individually in the Decision Memorandum, concluding in general that "of the major

exporters to India by quantity, only the WTA data for imports from the United States and

Germany could be considered to be adequately represented by the Infodrive data, whereas the

Infodrive quantity represents a significantly smaller coverage of the corresponding WTA

quantity for other significant exporters . . . ." *Id.* Commerce also found that import data from

four countries, Slovenia, Italy, Hong Kong, and Turkey, are present in the Infodrive data set but

not in the WTA data set. *Id.* at 20. Finally, Commerce relied on a fact not pertaining to its

stated criteria for using Infodrive data: variances between the WTA and Infodrive data with

respect to country-specific AUVs. *Id.* at 19.

      Commerce then determined that no probative weight was due CPZ's market economy

purchases of bearing-quality steel bar, stating that these purchases were "not appropriate prices

for surrogate valuation purposes based on established Department precedent." *Id.* at 21. The

Decision Memorandum did not identify the precedent on which it relied; however, the Decision

Memorandum, in discussing comments submitted by the petitioner, identified a policy of using

market prices paid for inputs to value the input "when the purchases account for over 33 percent

of the total quantity purchased from all sources." *Id.* at 16 n.29. The Decision Memorandum

adds that "[h]owever, when this information is not usable, and when faced with similar

competing SV sources, the Department has found that WTA import data, when taken as a whole,

are preferential because they represent an average of multiple price points and are tax exclusive."

*Id.*

      The record lacks substantial evidence to support the Department's finding that the WTA

import data pertaining to Indian HTS subheading 7228.30.29 are the "best available information"

on which to base the surrogate value for bearing-quality steel bar as a factor of production of

CPZ's subject merchandise.  The principal flaw in the Department's finding is that the value

shown by the data pertaining to Indian HTS subheading 7228.30.29, $1,889 per metric ton,

which is not specific to bearing-quality steel, is substantially higher than the AUVs shown by

each of the other data sets on the record that were specific to bearing-quality steel.  There are

three such data sets: Infodrive data for India, which show an AUV of $1,209.50 per metric ton

for bearing-quality steel bar imports in India, U.S. import data, which show an AUV of $1,081

per metric ton for bearing-quality steel bar, and the actual market-economy purchases of CPZ,

which show an AUV that, although confidential, can be described generally as comparable to

these other two bearing-quality-steel-specific AUVs.  Commerce disregarded all three of these

data sets as potential corroboration for an AUV obtained from WTA import data.  The bearing-

quality-specific AUVs corroborate closely the AUV of $1,164 per metric ton shown by the WTA

Thai HTS data.  They do not corroborate the $1,889 AUV the Department obtained from the

Indian HTS data.

Because it dismisses a significant amount of data on the value of bearing-quality steel

bar, the Department's analysis errs by failing to base its determination on the record considered

as a whole.  Some of the disregarded data (specifically, certain of the Infodrive data), unlike the

data Commerce did consider, pertain specifically to the prices for bearing-quality steel in a

country (India) economically comparable to China.  These data are relevant to and highly

probative on the question of how bearing-quality steel bar should be valued as a factor of

production.  The findings Commerce made to justify ignoring these data are unconvincing and

not supported by substantial evidence.

The Department's principal reasons for ignoring the Infodrive data, including the Infodrive data specific to Indian imports of bearing-quality steel bar, were that the data do not reflect the total quantity of imports in certain tariff "subcategories" as shown in WTA data and therefore are not as comprehensive as the WTA data and, in some cases, show greater quantities than the WTA data. *See id.* at 20 n.45 (expressing "some concern as to the reliability of Infodrive's reporting for these subcategories.").  Commerce also stated, as a secondary argument, that the Infodrive data showed different AUVs for exports from certain countries than the AUVs shown by the WTA data. *Id.* at 19.  The inconsistencies Commerce found to exist between WTA data and Infodrive data are not substantial evidence supporting the Department's finding that the Infodrive data are unreliable for any purpose.  Inconsistencies between the quantities reflected in the WTA and Infodrive data may suggest that one data set is more comprehensive than the other but do not show that the Infodrive data lack any probative value on the proper value of bearing-quality steel.  Inconsistencies between the AUVs reflected in the WTA and Infodrive data may be entitled to some weight on the premise that WTA data are based on official government statistics, but they are not substantial evidence for the premise that Infodrive data are unsuitable for any purpose, such as use as corroboration for certain WTA import data.

Commerce was also unjustified in disregarding entirely the evidence represented by the AUV for bearing-quality steel shown in the U.S. tariff database, which is relevant to the question of whether the Thai HTS data are better information than the Indian HTS data for valuing the bearing-quality steel bar input.  The mere fact that the data do not come from a country at a level of economic development comparable to that of China does not preclude Commerce from

considering those data in choosing between data from two countries that are economically

comparable to the nonmarket economy country.  *See Peer Bearing Company-Changshan v.

United States*, 35 CIT __, __, 752 F. Supp. 2d 1353, 1372 (2011).

Next, Commerce improperly disregarded the probative value of CPZ's market-economy

purchases of bearing-quality steel bar based on its precedents and based on its finding that the

WTA data are superior to the market-economy price data "because they represent an average of

multiple price points and are tax exclusive." *Decision Mem.* 16 n.29.  The market-economy

purchase data pertain to bearing-quality steel bar whereas the WTA data do not.  In addition, if

the price data for the market-economy purchases were presumed *not* to be tax exclusive, they

would be even more indicative than they already are that the AUV obtained from the WTA

Indian HTS database is atypically high and uncorroborated and, therefore, a poor basis for the

surrogate value of CPZ's use of bearing-quality steel bar.  The court does not hold or imply that

Commerce erred in declining to value the steel bar input exclusively on data from CPZ's market

economy purchases, but it concludes that Commerce erred in deciding, based on inadequate

reasoning, to give these data no probative weight.

Other factors underlying the Department's decision to base the surrogate value for steel

bar on the Indian WTA import data do not alter the court's conclusion that this decision is

unsupported by substantial record evidence.  In choosing between the Indian and Thai import

data, the Decision Memorandum relies in part on a regulatory preference for valuing each

surrogate value using data from the primary surrogate country, which was India.  In a previous

opinion involving the immediately prior review, the Court of International Trade stated that the

preference for use of data from a single surrogate country could support a choice of data as the

best available information where the other available data "upon a fair comparison, are otherwise

seen to be fairly equal . . . ."  *Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1373.  The Indian

data cannot be said to be "fairly equal" to the Thai data where, as noted previously, the AUV

from the Thai data is closely corroborated by the other data on the record and the AUV from the

Indian data is not.  The Department may give a preference to data from the chosen surrogate

country based on its regulation, 19 C.F.R. § 351.408(c)(2), but here the uniformity preferred by

the regulation is undercut not only by the lack of substantial evidence supporting the choice of

the Indian WTA data but also by the Department's valuing another factor (bearing-quality steel

wire rod) using Thai, not Indian, import data.  *Decision Mem.* 25.

        In choosing the Indian import data over the Thai data, Commerce also found that the

Indian data were "representative of an 8-digit basket category, the most specific on the record to

the input in question . . . ."  *Id.* at 17.  Both the Indian and Thai tariff data are at the level of an

eight-digit subheading in a "basket" category that is not specific to bearing-quality steel bar.  It is

possible to view the Indian data as more specific than the Thai data because the Indian

subheading contains exclusions for certain specific kinds of steel (bright bars, spring, lead

bearing, sulfur bearing, and tool and die) whereas the Thai subheading excludes only bar and rod

of circular cross section.  However, neither eight-digit subheading is specific to the steel being

valued, bearing-quality steel bar, as both are basket subheadings.  Because the AUV from the

Thai HTS data is closely corroborated by all record data that is specific to bearing-quality steel

bar and the AUV from the Indian data is not, whatever degree of additional specificity is

imparted to the result by the exclusions from the Indian subheading provides only minimal

evidentiary support for the finding that the Indian HTS data are the best available information on

the record for valuing the bearing-quality steel bar input.

Defendant's arguments to the court in defense of the Department's surrogate value are

not persuasive.  Defendant argues that the Department was not required to explain why the

Indian HTS data set was superior to the Thai HTS data set because CPZ argued only that the

AUV shown by the Indian HTS data was "too high," which is not "a colorable claim that the

Indian import data were aberrational," according to the Department's practice.  Def.'s Opp'n 22.

This argument fails to recognize that the court may not affirm the Department's determination of

a surrogate value unless that determination is supported by substantial evidence on the record as

a whole.  The strong corroboration the record provides to the AUV from the Thai HTS data and

the lack of corroboration on the record for the AUV from the Indian HTS data, although given

no consideration during the administrative review, must be considered by the court in applying

the substantial evidence standard of review to the determination at issue.  Defendant also

maintains that the U.S. import data lacked any relevance to the determination of the best

available information because the statute "requires that Commerce value surrogates in a market

economy country that is at a comparable level of economic development" to that of China and

"the United States is not considered economically comparable to China."  *Id.*  This argument

misreads the statute in arguing that the U.S. import data had no relevance to the determination at

issue.  The statute contemplates the use of data from countries at a comparable level of

development as the nonmmarket economy country as the source of a surrogate value; it does not

prohibit Commerce from considering data from developed countries as evidence to determine

which information is the best available.  *See Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1372

("The statute does not prohibit Commerce from considering, for corroboration purposes, record evidence consisting of prices for a commodity in a market economy country when determining which information from countries at a level of economic development comparable to China is the best available information.").

Defendant-intervenor argues that the AUV reflected by the Indian WTA data is corroborated by some U.S. import data because that value, $1,889 per metric ton, is within the range of country-specific AUVs reflected by the U.S. import data, which were as high as $10,625 per metric ton for U.S. imports originating in the United Kingdom.  Timken's Resp. 26. This argument overlooks the point that Commerce was selecting from among AUVs determined for all imports occurring in a given country.  The example cited by defendant-intervenor does not alter the court's conclusion that the Department's surrogate value is not supported by substantial evidence on the record of the review.

For the reasons the court has stated, substantial evidence does not exist on the record that can support the Department's decision to base the surrogate value of bearing-quality steel bar on the Indian WTA data.  Commerce on remand must redetermine the surrogate value for bearing-quality steel bar and reach a result that is supported by substantial evidence on the record.

<u>D.  The Department Must Redetermine its Surrogate Value for Steel Wire Rod</u>

Timken claims that the Department's selection of a surrogate value for one of CPZ's factors of production, "bearing-quality steel wire rod," was not supported by substantial evidence.  Timken's Mem. 13-20; *Decision Mem.* 25.  Commerce valued this factor using WTA import data pertaining to Thai HTS subheading 7228.50.90,[16] which show an AUV of $1,559 per

---

[16] The Thai HTS provides, in pertinent part, for the following subheadings under heading

(continued...)

metric ton. *Decision Mem.* 25; *Letter from CPZ to the Sec'y of Commerce* exhibit 2 (May 21,

2009) (Admin. R. Doc. No. 5554).  Also on the record were WTA import data pertaining to a

different Thai HTS subheading, 7228.50.10, which show an AUV of $2,084 per metric ton.

*Letter from Timken to the Sec'y of Commerce* exhibit 1 (Aug. 7, 2009) (Admin. R. Doc.

No. 5591).  These two Thai HTS subheadings differed only at the eight-digit level, with

7228.50.10 pertaining to articles "[of] circular cross-section," and 7228.50.90, the subheading

chosen by Commerce, pertaining to a basket category for articles not of circular cross-section.

Timken argues that the Department's use of the import data that applies to articles not of

circular cross-section was unlawful because "Commerce ignored record evidence that TRB wire

rods were circular in shape and failed to value them using surrogate prices for circular rods

(imports under Thai HS 7228.50.100)."  Timken's Mem. 14.  Defendant, after arguing for

affirmance of the Department's decision in its response, Def.'s Opp'n 12-18, now requests a

voluntary remand to reconsider this decision "in light of the factual issue raised by Timken

during the proceeding concerning the shape of steel wire rod used to produce subject

---

[16](...continued)
7228 ("Other bars and rods of other alloy steel; angles, shapes and sections, of other alloy steel; hollow drill bars and rods, of alloy or non-alloy steel"):
>   7228.10 Bars and rods, of high speed steel:
>   7228.20 Bars and rods, of silico-manganese steel:
>   7228.30 Other bars and rods, not further worked than hot-rolled, hot-drawn or extruded:
>   7228.40 Other bars and rods, not further worked than forged:
>   7228.50 Other bars and rods, not further worked than cold-formed or cold-finished:
>> 7228.50.10000 Of circular cross-section
>> 7228.50.90000 Other
>   7228.60 Other bars and rods:
>   7228.7000000 Angles, shapes and sections:
>   7228.80 Hollow drill bars and rods.
Harmonized Tariff Schedule of Thailand, *available at* http://www.customsinfo.com (last visited on Nov. 21, 2011).

merchandise," Def.'s Remand Mot. 2.  Defendant states that "Commerce intends to reconsider its

analysis of the record; consider whether to request additional information from the parties; and

issue a new determination." *Id.*

The court cannot sustain the Department's choice of a surrogate value without a finding

of fact, supported by substantial record evidence, that the product being valued was not of a

circular cross-section. *See Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1375-76.  The record

lacks such a finding in this case.  Without such a finding, and in light of defendant's voluntary

remand request, the court will order Commerce to redetermine this surrogate value.

### III. CONCLUSION

Commerce must reconsider its determination of the country of origin of subject

merchandise finished and assembled in Thailand and must reconsider and redetermine the

surrogate values for bearing-quality steel bar and bearing-quality steel wire rod.  The court

concludes that no relief is available on CPZ's challenge to the assessment rate Commerce

applied to entries of subject merchandise made by Peer.

### ORDER

Upon review of *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from

the People's Republic of China: Final Results of the 2007-2008 Admin. Review of the

Antidumping Duty Order*, 75 Fed. Reg. 844 (Jan. 6, 2010) ("Final Results") and all papers and

proceedings herein, it is hereby

**ORDERED** that the Rule 56.2 Motion for Judgment upon the Agency Record of plaintiff
Peer Bearing Company - Changshan ("CPZ") be, and hereby is, GRANTED in part and
DENIED in part as specified in this Opinion and Order; it is further

**ORDERED** that the Rule 56.2 Motion for Judgment upon the Agency Record of plaintiff The Timken Company ("Timken") be, and hereby is, GRANTED as specified in this Opinion and Order; it is further

**ORDERED** that the International Trade Administration, U.S. Department of Commerce ("Commerce") shall issue upon remand a redetermination ("Remand Redetermination") that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that Commerce, in preparing the Remand Redetermination in accordance with this Opinion and Order, shall reconsider, and modify as appropriate, its determination of the country of origin of subject merchandise that was finished and assembled in Thailand; it is further

**ORDERED** that Commerce, in preparing the Remand Redetermination in accordance with this Opinion and Order, shall redetermine the surrogate value of bearing-quality steel bar; it is further

**ORDERED** that Commerce, in preparing the Remand Redetermination in accordance with this Opinion and Order, shall redetermine the surrogate value of bearing-quality steel wire rod; it is further

**ORDERED** that Commerce shall file the Remand Redetermination no later than ninety (90) days from the date of this Opinion and Order; it is further

**ORDERED** that CPZ and Timken shall have thirty (30) days from defendant's filing of the Remand Redetermination to file any comments thereon; and it is further

**ORDERED** that defendant shall have fifteen (15) days from the filing of plaintiffs' comments in which to file any response.

 /s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: November 21, 2011
      New York, New York