Slip Op. 13- 72

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PEER BEARING COMPANY - CHANGSHAN**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **THE TIMKEN COMPANY**, <br><br> Defendant-intervenor. | **Before: Timothy C. Stanceu, Judge** <br><br> **Consol. Court No. 10-00013** |

## <u>OPINION AND ORDER</u>

[Sustaining in part, and remanding in part, a Commerce Department remand redetermination in an action contesting the final results of an administrative review of an antidumping duty order on tapered roller bearings and parts thereof from China]

Dated: June 6, 2013

*John M. Gurley* and *Diana Dimitriuc Quaia*, Arent Fox LLP, of Washington, DC, argued for plaintiff. With them on the brief was *Matthew L. Kanna*.

*L. Misha Preheim*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Joanna V. Theiss*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*William A. Fennell* and *Terence P. Stewart*, Stewart and Stewart, of Washington, DC, argued for defendant-intervenor. With them on the brief was *Stephanie R. Manaker*.

Stanceu, Judge: Before the court is a decision (the "Remand Redetermination") the

International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department") issued in response to the court's order in *Peer Bearing Company-Changshan v. United States*, 35 CIT __, 804 F. Supp. 2d 1337 (2011). *Final Results of Redetermination Pursuant to Court Remand* (Apr. 11, 2012), ECF No. 107 ("*Remand Redetermination*"). In this consolidated action, plaintiffs Peer Bearing Company-Changshan ("CPZ") and The Timken Company ("Timken") contested the determination ("Final Results") Commerce issued to conclude the twenty-first review of an antidumping duty order on tapered roller bearings ("TRBs") and parts thereof, finished and unfinished (the "subject merchandise"), from the People's Republic of China ("China" or the "PRC"). *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Admin. Review of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Jan. 6, 2010) ("*Final Results*").[1] Compl. (Jan. 20, 2010), ECF No. 2; Compl. (Mar. 5, 2010), ECF No. 11 (Court No. 10-00045). The twenty-first review pertained to entries of subject merchandise made during the period of June 1, 2007 through May 31, 2008 ("period of review" or "POR"). *Final Results*, 75 Fed. Reg. at 845.

For the reasons discussed in this Opinion and Order, the court sustains the Remand Redetermination as to two decisions therein, both of which pertain to surrogate values for CPZ's production inputs. The court orders a second remand to address another issue in this case, which is whether Commerce acted lawfully in determining that certain TRBs processed in Thailand

---

[1] The scope of the order is "tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use." *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Admin. Review of the Antidumping Duty Order*, 75 Fed. Reg. 844, 845 (Jan. 6, 2010).

using Chinese-origin parts should be considered to be merchandise subject to the antidumping

duty order.

## I. BACKGROUND

The background of this case is presented in *Peer Bearing Company-Changshan*, 35 CIT

at __, 804 F. Supp. 2d at 1340-41, and is supplemented briefly herein.

In contesting the Final Results, CPZ, a Chinese producer of subject merchandise,

challenged: (1) the Department's decision that certain TRBs further manufactured in Thailand

from Chinese-origin parts were, for antidumping duty purposes, products of Chinese origin and

therefore subject merchandise, (2) the Department's method of calculating an assessment rate to

be applied to subject merchandise imported by CPZ's U.S. affiliate, Peer Bearing Co., and

(3) the Department's surrogate value for its production input of bearing-quality steel bar. *Id.*

at __, 804 F. Supp. 2d at 1339.  Timken, a domestic producer of tapered roller bearings (and also

a defendant-intervenor in this consolidated action), challenged the Department's surrogate value

for bearing-quality steel wire rod, another production input CPZ used in producing the subject

merchandise.  *Id.* at __, 804 F. Supp. 2d at 1339-40.

In *Peer Bearing Company-Changshan*, the court sustained the Department's assessment

rate methodology but held unlawful the Department's determining the TRBs processed in

Thailand to be subject merchandise and the surrogate values Commerce applied to

bearing-quality steel bar and steel wire rod.  *Peer Bearing Company-Changshan*, 35 CIT at __,

804 F. Supp. 2d at 1355.  The court ordered Commerce to reconsider its country of origin

determination and to redetermine the steel bar and steel wire rod surrogate values.  *Id.* at __,

804 F. Supp. 2d at 1355-56.

In its Remand Redetermination, filed on April 11, 2012, Commerce redetermined the two

surrogate values but again concluded that the TRBs processed in Thailand were of Chinese

origin and therefore subject merchandise.  *Remand Redetermination* 1.  As a result of the

redetermined surrogate values, Commerce revised CPZ's weighted-average dumping margin

from 24.62% to 7.37%.  *Id.* at 28.  CPZ and Timken filed comments on the Remand

Redetermination on May 11, 2012.  Pl. Peer Bearing Company-Changshan's Comments on

Def.'s Final Results of Redetermination Pursuant to Court Remand, ECF No. 112 ("CPZ's

Comments"); The Timken Company's Comments on the Dept. of Commerce's Remand

Redetermination, ECF No. 111 ("Timken's Comments").  Defendant replied to those comments

on June 26, 2012.  Def.'s Reply to Pls.' Comments upon the Remand Redetermination, ECF

No. 125 ("Def.'s Reply").

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2006), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a (2006),[2] including an

action contesting the final results of an administrative review that Commerce issues under

section 751 of the Tariff Act, 19 U.S.C. § 1675(a).  The court will sustain the Department's

redetermination if it complies with the court's remand order, is supported by substantial evidence

on the record, and is otherwise in accordance with law.  *See* Tariff Act, § 516A, 19 U.S.C.

§ 1516a(b)(1)(B)(i).

### A.  The Court Sustains the Department's Redetermined Surrogate Value for Bearing-Quality Steel Bar

In the Final Results, Commerce determined a surrogate value ("SV") for CPZ's

bearing-quality steel bar input according to World Trade Atlas ("WTA") import data pertaining

---

[2] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2006 edition.

to Indian Harmonized Tariff Schedule ("HTS") subcategory 7228.30.29, which reflected an

average unit value ("AUV") of $1,889 per metric ton. *Peer Bearing Company-Changshan*,

35 CIT at __, 804 F. Supp. 2d at 1347-48 (citation omitted).  Commerce chose this data set over

others on the record, which included WTA data for Thailand HTS subcategory 7228.30.90

showing an AUV of $1,164 per metric ton. *Id*. at __, 804 F. Supp. 2d at 1349 (citation omitted).

The court rejected the Department's determination that the Indian WTA data were the "best

available information," 19 U.S.C. § 1677b(c)(1), for use in valuing the steel bar input,

concluding that this determination was unsupported by substantial evidence on the record

considered as a whole. *Id*. at __, 804 F. Supp. 2d at 1347-54.  "The principal flaw in the

Department's finding is that the value shown by the data pertaining to Indian HTS subheading

7228.30.29, $1,889 per metric ton, which is not specific to bearing-quality steel, is substantially

higher than the AUVs shown by each of the other data sets on the record that were specific to

bearing-quality steel."[3] *Id*. at __, 804 F. Supp. 2d at 1351.  The court concluded that Commerce,

citing its "benchmarking practices," disregarded these other data sets as potential corroboration

for an AUV obtained from WTA import data and that "[t]he bearing-quality-specific AUVs

corroborate closely the AUV of $1,164 per metric ton shown by the WTA Thai HTS data." *Id*.

at __, 804 F. Supp. 2d at 1350-51.  The court further concluded that "[t]hey do not corroborate

the $1,889 AUV the Department obtained from the Indian HTS data." *Id*. at __, 804 F. Supp. 2d

at 1351.

---

[3] The court cited three data sets on the record that were specific to bearing-quality steel: Infodrive data for India, showing an average unit value ("AUV") of $1,209 per metric ton for bearing-quality steel bar imports in India; U.S. import data, with an AUV of $1,081 per metric ton for U.S. bearing-quality steel bar imports; and market-economy purchases for Peer Bearing Company-Changshan, with an AUV that, although confidential, could be described generally as comparable to these other two AUVs. *Peer Bearing Company-Changshan v. United States*, 35 CIT __, __, 804 F. Supp. 2d 1337, 1351 (2011).

In the Remand Redetermination, Commerce used WTA import data for Thai HTS

subcategory 7228.30.90 to value CPZ's steel bar input.  *Remand Redetermination* 28.  Quoting

the court's decision, Commerce stated its reasoning as follows:

> For the reasons discussed in the *Final Results*, we continue to find that the use of
> certain sources for benchmarking purposes remains inconsistent with
> longstanding Department practice and policy.  However, we have re-evaluated the
> potential SV sources for this factor of production ("FOP") in light of the Court's
> holding that there is not substantial evidence on the record to support the use of
> the Indian HTS category to value steel bar.  Specifically, we find that the Thai
> import data under HTS category 7228.30.90 are publicly available, broad market
> averages, contemporaneous with the POR, tax-exclusive, and representative of
> significant quantities of imports, thus satisfying key elements of the Department's
> SV test.  Moreover, the Thai import data are from an HTS category which is
> among the most specific on the record for purposes of valuing CPZ's steel bar
> input.  Further, these data are both reliable in that they are comprised of official
> government import statistics, and appropriate in that they come from a country
> which the Department found to be both economically comparable to the People's
> Republic of China ("PRC") and a significant producer of subject merchandise.

*Id*. at 4-5 (footnotes omitted).

CPZ concurs in, and Timken opposes, the Department's decision to use the Thai import

data for HTS subcategory 7228.30.90 to value CPZ's bearing-quality steel bar input.  CPZ's

Comments 3-4; Timken's Comments 2-8.  Timken argues that substantial evidence does not

support the Department's finding that these data are the best available information on the record.[4]

Timken's Comments 2.  Timken argues that Thai HTS subcategory 7228.30.90 is not specific to

the input being valued, citing certain proprietary record data that Timken characterizes as

evidence that CPZ's steel bar input possessed a certain characteristic inconsistent with that

---

[4] In the comments on the Remand Redetermination that The Timken Company
("Timken") submitted to the International Trade Administration, U.S. Department of Commerce
("Commerce" or the "Department"), Timken advocated using a subset of import data from
Infodrive India for Indian Harmonized Tariff Schedule subcategory 7228.30.29 that can be
identified as "bearing quality."  *Final Results of Redetermination Pursuant to Court Remand* 17
(Apr. 11, 2012), ECF No. 107.  Timken does not advocate this position in the comments it filed
with the court.

subcategory.[5]  *Id.* (citations omitted).  Commerce did not make a finding of fact in either the

Final Results or the Remand Redetermination on the question of whether CPZ's steel bar input,

as a general matter, possessed the characteristic Timken identifies.[6]  The proprietary record data

Timken cites in support of its position, *id.* at 6-7, do not pertain to CPZ's home market purchases

of steel bar and represent only a small fraction of CPZ's overall steel bar production input.  The

court views this evidence as minimally probative, insubstantial, and therefore insufficient to

require Commerce, upon consideration of the record as a whole, to have reached a finding that

CPZ's steel bar input generally possessed the characteristic to which Timken refers.  The court,

therefore, rejects Timken's argument.

  The Department's decision on remand to use import data from Thai HTS subcategory

7228.30.90 to value the steel bar input responds directly to the shortcoming the court identified

in the surrogate value Commerce selected for the Final Results.  In the language from the

Remand Redetermination quoted above, Commerce adequately explained the reasons for its

redetermined surrogate value.  The court sustains this choice because it complies with the court's

remand order and is supported by substantial record evidence, including the record evidence

pertaining to the value of bearing-quality steel, which corroborates the value the Department

selected.

---

[5] The particular characteristic is not disclosed in this Opinion and Order due to a claim for proprietary treatment.

[6] In its response to comments on the Remand Redetermination, defendant objects that Timken raised this issue only in the remand proceeding, too late for proper consideration by the Department.  Def.'s Reply to Pls.' Comments upon the Remand Redetermination 10-11 (June 26, 2012), ECF No. 125.  Because the court, in its discretion, chooses to consider Timken's argument on the merits, it does not reach defendant's objection.

B.  The Court Sustains the Department's Redetermined Surrogate Value for Bearing-Quality
Steel Wire Rod

Defendant requested, and the court granted, a voluntary remand so that Commerce could

reconsider its surrogate value for bearing-quality steel wire rod, which Commerce had

determined according to a Thai tariff provision that did not pertain to products of a circular

cross-section.  *Peer Bearing Company-Changshan*, 35 CIT at __, 804 F. Supp. 2d at 1354-55.

The court concluded that the surrogate value Commerce determined in the Final Results was

unsustainable without a finding of fact, supported by substantial record evidence, that the input

being valued was not of a circular cross-section.  *Id.*

In the Remand Redetermination, Commerce redetermined the surrogate value according

to WTA data for Thai HTS subcategory 7228.50.10, which corresponds to steel rod that is of a

circular cross-section.  *Remand Redetermination* 1, 28.  Commerce stated that subcategory

7228.50.10 is appropriate based on plaintiff's indication in a December 2011 questionnaire

response that the steel wire rod input consumed by CPZ was of circular cross-section.  *Id.* at 6

(footnote omitted).  The redetermined surrogate value complies with the court's remand order,

and no party opposed this redetermined surrogate value in comments filed before the court.

CPZ's Comments 3; Timken's Comments 1-2.  The court, therefore, affirms this aspect of the

Remand Redetermination.

C.  A Second Remand is Required on the Department's Determination of the Country of Origin
of Certain TRBs Processed in Thailand

In *Peer Bearing Company-Changshan*, the court ordered Commerce to redetermine the

country of origin of certain TRBs subject to the twenty-first review that resulted from

processing, including assembly, performed in Thailand by a CPZ affiliate.  *Peer Bearing

Company-Changshan*, 35 CIT at __, 804 F. Supp. 2d at 1342.  Applying what it termed a

"substantial transformation" and "totality of the circumstances" test, Commerce had determined

in the Final Results that the TRBs at issue were of Chinese origin and therefore subject to the

antidumping duty order.  *Id*. at __, 804 F. Supp. 2d at 1341.

The Thai manufacturing operations were performed using unfinished cups and cones that

were forged, turned, and heat-treated in China and finished rollers and cages that were made in

China.  *Id*. (citation omitted).  CPZ's affiliate in Thailand performed additional grinding and

honing ("finishing") on the cups and cones to achieve the required size and polished finish and

assembled the cups, cones, rollers, and cages to produce finished TRBs.  *Id*.; *Remand

Redetermination* 6-7 (footnotes omitted).

In reviewing the Department's country of origin determination as set forth in the Final

Results, the court rejected a finding that the costs incurred by CPZ's processor in Thailand were

not significant compared to the cost of manufacture of each subject TRB product, determining

the finding to be "unsustainable under the substantial evidence standard of review."  *Peer

Bearing Company-Changshan*, 35 CIT at __, 804 F. Supp. 2d at 1342.  The court noted that the

record contains evidence that the processing costs in Thailand accounted for 42% of the total

cost of manufacturing.  *Id*. (footnote omitted).  The court noted that "[w]hile possessing

significant discretion in making country-of-origin determinations . . . Commerce may not

disregard record evidence that detracts significantly from, and appears to refute, one of the

findings on which the Department relied."  *Id*. (internal citation omitted).  The court directed

Commerce to "reconsider on the whole its determination of the country of origin of the bearings

that underwent further processing in Thailand . . . ensur[ing] that its redetermination of the origin

of these bearings is based on findings supported by substantial evidence on the record of this

case."  *Id*.

In the Remand Redetermination, Commerce again concluded that the TRBs processed in

Thailand are products of China for purposes of the antidumping duty order.  *Remand*

*Redetermination* 17.  Commerce once more applied what it described as a "substantial transformation" and "totality of the circumstances" test, under which it applied the following six criteria: (1) "class or kind" of the subject merchandise; (2) physical/chemical properties and essential character; (3) nature/sophistication of processing; (4) level of investment; (5) ultimate use; and (6) third country cost of manufacturing ("COM") as a percentage of total COM.  *Id.* at 8-17.

CPZ continues to oppose the Department's country of origin determination.  CPZ's Comments 4-14.  CPZ argues, *inter alia*, that the determination "remains woefully unsupported by a persuasive rationale, while uprooting twenty years of country of origin practice by U.S. Customs and Border Protection ('Customs') along with importers' expectations of finality with respect to imports of TRBs forged in one country and ground, finished and assembled in another country."  *Id.* at 5.  CPZ further characterizes the Department's analysis as "flawed" because the analysis "does not properly account for the facts presented in this proceeding and the information provided on the record by CPZ."  *Id.* at 14.  Timken supports the Department's country of origin determination but does not offer any specific comments on the issue.  Timken's Comments 1.

The Court of International Trade previously considered, and rejected, a country of origin determination in a circumstance nearly identical to that presented by this case.  In the subsequent (twenty-second) periodic administrative review of the antidumping duty order on TRBs from China, Commerce also concluded that TRBs that were further processed in Thailand from parts made in China were products of China for purposes of the antidumping duty order.  *Peer Bearing Company-Changshan*, 36 CIT __, __, 884 F. Supp. 2d 1313, 1320-25 (2012).  Commerce applied six criteria that were very similar to those it applied in the Remand Redetermination.  Upon a challenge by Peer Bearing Company-Changshan ("CPZ"), this Court, identifying three flaws, rejected the Department's country of origin determination in the entirety

and remanded the issue for redetermination.  *Id*. at __, 884 F. Supp. 2d at 1325.  First, in

applying its totality of the circumstances test, the court noted that Commerce gave weight to its

initial criterion, the inclusion of finished and unfinished parts of TRBs within the class or kind of

merchandise defined by the scope of the Order, but Commerce provided no reason why this

criterion was relevant, on the record of that case, to the country of origin determination being

made.  *Id*. at __, 884 F. Supp. 2d at 1320-22.  Second, with respect to its "cost of

production/value added" criterion, the Department found that the processing performed in

Thailand did not represent a significant value added to the finished product, a finding that this

Court held to be unsupported by substantial evidence on the record as a whole.  *Id*. at __, 884 F.

Supp. 2d at 1322-23.  The third flaw pertained to the "ultimate use" criterion.  Commerce found

significant to its decision its finding that an unfinished TRB is intended for the same ultimate

end-use as a finished TRB, but that finding, the court concluded, had no apparent relevance to

the country of origin question posed by that case, which, as here, involved third country

processing performed on finished and unfinished TRB parts, not on unfinished TRBs.  *Id*. at __,

884 F. Supp. 2d at 1323-24.  For reasons similar to those set forth in *Peer Bearing*

*Company-Changshan*, *id*. at __, 884 F. Supp. 2d at 1320-25, the court identifies flaws in the

Department's analysis of the country of origin issue in this case that require a second remand

order.

### 1.  Commerce Failed to Provide Reasons Why the Inclusion of Finished and Unfinished Parts in the Scope of the Order Was Relevant to its Country of Origin Determination

Applying its first criterion, "class or kind" of merchandise, the Remand Redetermination

found that "[t]he unfinished components shipped by CPZ to Thailand (*i.e.*, cups and cones), and

the finished TRBs and components exported from Thailand, are within the same class or kind of

merchandise."  *Remand Redetermination* 8 (footnote omitted).  The Remand Redetermination

concluded that "[t]he fact that both the finished and unfinished products are within the scope of

the order suggests that the TRBs are not substantially transformed in Thailand." *Id*.

The court fails to see how the "fact that both the finished and unfinished products" are

within the scope of the order "suggests" that a substantial transformation did not occur in

Thailand, and the Remand Redetermination offers no reasoning in support of this conclusion.

That the Chinese-origin parts would have been considered subject merchandise had they been

exported to the United States has no apparent relevance to the issue presented by this case, which

is the country of origin of the finished TRBs.  To resolve that issue according to a "substantial

transformation" analysis, Commerce must decide whether the Chinese-origin parts, finished and

unfinished, were substantially transformed by the processing in Thailand that converted these

parts into finished TRBs.  The Remand Redetermination not only reaches a conclusion

unsupported by reasoning but also errs in misstating the issue, framing it as one of whether

*TRBs*, as opposed to the finished and unfinished parts, are "substantially transformed in

Thailand."  *See id*.  For these reasons, the court concludes that the Remand Redetermination

erred in applying, and giving weight to, the Department's first criterion.

2.  The Department's Analysis under its Second Criterion Reaches Ultimate Findings that Are
Not Supported by Substantial Evidence on the Record

Under its second criterion, "physical/chemical properties and essential character,"

Commerce reached a number of findings.  It found that "[t]he forging process is where the main

physical properties are established in that this operation imparts the strength, initial hardness and

the physical shape of the cup and cone."  *Remand Redetermination* 9.  It also found that "[t]he

turning process is where the cups and cones are ground to just within final customer

specifications so that they are ready for heat treatment" and that "[t]he heat treatment process is

equally crucial because it changes the chemical/mechanical characteristic of the cup and cone to

ensure durability, hardness and shock resistance." *Id*. (footnote omitted).  Although there is

evidence on the record that could support these subsidiary findings, the Department reached

ultimate findings under its second criterion that are impermissible: "While all stages of

production are necessary to obtain the final quality and tolerance levels for a finished TRB or

TRB component, in this case, the finishing processes performed in Thailand on the cups and

cones impart no substantial changes to the *physical* properties and no change to the

chemical/*mechanical* properties or essential character *of the merchandise* that would constitute a

substantial transformation *of the merchandise*." *Id*. at 10 (footnote omitted) (emphasis added).

Except for the finding as to "chemical" properties, these ultimate findings are not supported by

substantial evidence on the record.

As is obvious from the record evidence, a TRB is designed and built to perform

load-bearing and friction-reducing functions in the machine to which it is fitted.  Commerce did

not find, and on this record could not permissibly have found, that any single component

produced in China possessed the physical properties, mechanical properties, or essential

character of the "merchandise," which in this case consisted of finished TRBs, not unfinished

TRBs or parts.  And because no single part made in China possessed the essential character of a

TRB, the Department's finding that the essential character of the finished TRBs was imparted in

China, as opposed to Thailand, is a logical impossibility.

The Department's findings that the processing conducted in Thailand imparted no

changes to the mechanical properties, and no substantial changes to the physical properties, of

the merchandise at issue are not supported by substantial record evidence.  The record evidence

will not permit a finding that any part produced in China had the mechanical or physical

properties characterizing a finished TRB, which were acquired only following the finishing and

assembly processes.  As the Department noted, when exported to Thailand, each cup and each

associated cone, the two major components of a TRB, were unfinished.  Therefore, in the form in which they were exported, the cups and cones could not even perform their respective functions as TRB *parts* because they had not been ground and polished to their final finish and dimensions. *Remand Redetermination* 8-9.  For these reasons, the court must reject all but one of the ultimate findings Commerce reached under its second criterion.

   3.  Substantial Evidence Does Not Support the Department's Finding, Reached under its Third Criterion, that the Nature, Extent and Sophistication of the Thai Processing Were Not Significant

       With respect to its third criterion, "nature/sophistication of processing," Commerce described the grinding and honing of the cups and cones in Thailand as "machine processes" encompassing "a series of steps wherein the width, the outside diameter, and bore of the rings (cup and cone) are ground and the inside diameter of the outer ring and the outside diameter of the inner ring are polished."  *Remand Redetermination* 11 (footnote omitted).  Commerce stated that "[w]hile we acknowledge that the grinding process may on its face appear to be sophisticated because machines are used in this operation, we find that the nature and extent of the finishing processing performed in Thailand does [sic] not support a finding that the TRBs are substantially transformed because the finishing operations serve only to further refine the cup and cone's finished measurements and polish the roller raceway."  *Id*. (footnote omitted).  Later in the Remand Redetermination, Commerce stated a finding that "the nature, extent and sophistication of the Thai processing were also not significant."  *Id*. at 24.

       The Department's conclusion under its third criterion relies largely on the finding that the machining operations performed on the cups and cones in Thailand create the final dimensions and surface finish, which in the Department's view are not as important as the processes in China that forge, turn, and heat-treat the cups and cones.  Commerce viewed the Thai processing as less "sophisticated" than the processing conducted on the cups and cones in China, which is merely a

descriptive characterization for which Commerce provided little reasoning.  Even were the court

to accept this characterization, it could not sustain the Department's finding that "the nature,

extent and sophistication of the Thai processing were also *not significant*."  *Id*. (emphasis added).

That finding is not supported by substantial evidence on the record, which contains evidence,

acknowledged in the Remand Redetermination, that the processing conducted in Thailand on the

cups and cones involved multiple stages of grinding and honing.  *Id.* at 13-14, 24, 26 (footnotes

omitted).  That processing also included assembly operations, which involved multiple stages.

*Id*. at 13, 27 (footnotes omitted).  As Commerce acknowledged elsewhere in the Remand

Redetermination, the grinding and honing operations performed on the cups and cones in

Thailand "serve an important role in the production of a bearing . . . ."  *Id.* at 9-10.  The reliance

on an unsupported finding of fact compromises the analysis Commerce conducted under its third

criterion.

   4.  The Record Does Not Support the Finding under the Fourth Criterion that the Investment in
   the Thai Equipment Is Not "Significant" in Comparison to the Investment in the PRC Equipment

        With regard to its fourth criterion, "level of investment," Commerce acknowledged that

due to a lack of record data it is unable to "quantify a monetary value of investment," adding that

it "does not have a threshold for considering a certain level of investment to be significant in a

substantial transformation analysis."  *Remand Redetermination* 12 (footnote omitted).  Despite

the acknowledged limitations, Commerce proceeded to apply its fourth criterion, stating that

"[t]hus, for purposes of the redetermination we have analyzed the production equipment used in

each stage of production in the PRC and in Thailand in order to make a finding concerning the

level of investment."  *Id*.  The record evidence upon which Commerce made this finding

consisted of purely qualitative descriptions of the processing performed in China and the

processing performed in Thailand.  Based on this evidence, Commerce characterized the Thai

production stages as requiring "significantly less machinery, and less sophisticated machinery than the PRC production stages." *Id*. at 27 (footnote omitted).

Whether or not supporting the Department's general characterization regarding how "sophisticated" the machinery was, the record does not support the finding of "significantly less machinery" in Thailand for a reason Commerce admits: the record lacked quantitative data. Commerce also admitted that it has no quantitative threshold for what is a "significant" level of investment yet proceeded to find, paradoxically, that "based on the types of equipment required for the production stages in the PRC versus the type of equipment required for the finishing and assembly processing occurring in Thailand, the investment in the Thai equipment is *not significant* in comparison to the investment in the PRC equipment." *Id*. at 14 (emphasis added). As the Remand Redetermination acknowledges, the record not only lacked quantitative data but included evidence that the cups and cones underwent multiple stages of processing in Thailand requiring "an investment for machinery" and evidence that all assembly operations for the TRBs at issue took place in Thailand. *Id*. at 12-14, 25-27.  Because such evidence is present, the record as a whole cannot support the finding that the investment in production equipment in Thailand was not "significant," either by itself or in comparison with the investment in China.

 5.  The Department's "Ultimate Use" Findings Erroneously Analyze "Unfinished TRBs," Irrelevantly Cite the Scope of the Order, and Ignore Probative Evidence of Different Uses

The Department's fifth criterion in its "totality of the circumstances" test is "ultimate use." *Remand Redetermination* 14.  Commerce considered this factor to support the conclusion that "there is no substantial transformation between the unfinished and the finished merchandise." *Id*. (footnote omitted).  The Remand Redetermination states two findings under the fifth criterion, on the basis of which Commerce "determined that the ultimate use factor supports the conclusion that there is no substantial transformation between the finished and the

unfinished merchandise." *Id.*  Because both findings are flawed, the court rejects the analysis Commerce performed under its "ultimate use" criterion.

Commerce found, first, that "[t]he fact that the scope of the *Order* includes TRBs and parts thereof (cups, cones, rollers, cages, *etc.*), finished and unfinished, indicates that both finished and unfinished TRBs are intended for the same ultimate end-use, that is, a finished TRB that can ultimately be used in a downstream product." *Id.* (footnote omitted).  The inclusion of this finding in the Remand Redetermination is erroneous in two respects.  First, the finding as Commerce stated it is irrelevant in light of the facts of this case, which does not involve "unfinished TRBs."  Commerce did not find, and on this record could not permissibly have found, that any of the parts exported to Thailand, finished or unfinished, could be considered to have been unfinished TRBs.  The second error is one of logic: the inclusion of "parts" within the scope of the antidumping duty order has no relationship to the question of ultimate end-use.  The use of any good, including its "ultimate" use, is a question of fact that is not dependent on the scope of an antidumping duty order.

The Remand Redetermination states the second objectionable finding as follows: "Furthermore, we also find that these products do not need to be interchangeable to determine their ultimate use because we found that the expected use of the unfinished TRB components is the same use as that of finished TRBs." *Id.*  In the form in which it was stated by Commerce, this finding is contradicted by the record evidence in this case.  As demonstrated by the record evidence, the only "expected" use of the unfinished TRB components that were exported to Thailand could have been the use to which they were put, *i.e.*, use in the production of finished cups and cones in Thailand, and the only "expected" use of the cups and cones was in the assembly process, also performed in Thailand, resulting in finished TRBs.  *Id.* at 6-7, 41.

The court must consider the two findings and the associated reasoning just as presented in

the Remand Redetermination.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  But even if

the court were to overlook the obvious errors in the manner in which the two findings discussed

above are stated, it still would note that the fifth criterion is overly narrow in considering only

"ultimate use" and not all of the probative record evidence on the issue of the uses of the parts

exported to Thailand.  In applying the fifth criterion, Commerce appears to give little or no

consideration to the record fact that the two major TRB components, the cups and cones, were

not suitable for use in the assembly process in the form in which they were exported to Thailand.

*Remand Redetermination* 6-7, 41.

### 6.  As Commerce Acknowledges, Its Revised Cost of Manufacturing Percentage for the Thailand Processing Could Support a Determination of Substantial Transformation

In applying the sixth criterion, "third country COM as a percentage of total COM,"

Commerce responded to the court's discussion of record evidence that the processing costs in

Thailand accounted for 42% of the total cost of manufacturing.  *Remand Redetermination* 7,

14-15 (citing *Peer Bearing Company-Changshan*, 35 CIT at __, 804 F. Supp. 2d at 1342).

Commerce re-examined the data underlying the 42% COM calculation and changed the

calculation in two respects.  First, it applied its revised surrogate values.  *Id*. at 15 (footnote

omitted).  Second, it revised the calculation formula, concluding that the formula incorrectly

included some costs incurred in Thailand that were "unrelated to manufacturing, *i.e.*, selling,

general and administrative costs, financial expenses and/or profit."  *Id*.

The changes to the calculation reduced the result from the 42% percentage, *id*. at 16, but

the revised percentage (which is proprietary) cannot fairly be characterized as insignificant.

Moreover, the extent of the reduction from 42% effected by the Department's recalculation can

be fairly characterized as minor.  Commerce acknowledged that its recalculated percentage of

COM occurring in Thailand "may be meaningful," *id.*, and that "considered on its own" it "could

be part of an analysis that finds in favor of substantial transformation," *id.* at 23.  Commerce

went on to conclude that "nevertheless, no single factor is dispositive" and that the recalculated

percentage "is not so significant as to outweigh the other factors which the Department must take

into account," *id*. at 16, each of which "clearly weigh[s] against a finding of substantial

transformation," *id*. at 28.  However, as the court discussed above, the Department's analyses

under each of the other five criteria are flawed.

    7.  On Remand, Commerce Must Reconsider its Determination that the TRBs Processed in
        Thailand Were of Chinese Origin for Purposes of the Antidumping Duty Order

        On remand, Commerce must reach a new country of origin determination because the

record in this case lacks substantial evidence to support the Department's current determination

that the TRBs processed in Thailand were products of China for purposes of the antidumping

duty order.  The Remand Redetermination acknowledges, and the record confirms, that the cups

and cones (which, irrefutably, are the two major components of each TRB) were exported to

Thailand in unfinished form, *Remand Redetermination* 9-10; that the grinding and honing

operations performed on the cups and cones in Thailand, in the Department's own words, "serve

an important role in the production of a bearing . . . ," *id*.; that all assembly operations took place

in Thailand, *id*.; and that the percentage of the cost of manufacturing that was incurred in

Thailand, in the Department's words, was "meaningful" and "could be part of an analysis that

finds in favor of substantial transformation," *id.* at 23.  In reaching its determination, Commerce

impermissibly relied on certain critical findings of facts that, as discussed above, were not

supported by substantial evidence on the record and that, in some cases, were reached without

consideration of probative evidence to the contrary.  Among the disregarded evidence is the

evidence that no single component exported to Thailand possessed the physical properties,

mechanical properties, or essential character of a finished TRB.  Commerce acknowledged that

the analysis it performed under its sixth criterion (percentage of COM) could support a finding

that Thailand is the country of origin, and the analyses conducted under the other five criteria

were flawed for the reasons the court has discussed, with the first criterion not having been

shown to have any relevance to the country of origin question posed by this case.  Moreover,

some of the discussion in the Remand Redetermination appears to lose sight of the "substantial

transformation" issue that the case actually presents, which is whether the Chinese-origin parts,

finished and unfinished—no one of which was an unfinished bearing—were substantially

transformed by the processing that occurred in Thailand.  The Remand Redetermination refers to

"unfinished" TRBs even though no unfinished TRBs are at issue in this case.

In replying to plaintiff's comments on the Remand Redetermination, defendant argues

that plaintiff raised certain arguments in its comments to the court that it did not raise in its draft

comments on the Remand Redetermination.  Defendant points specifically to comments on the

"physical/chemical properties/essential character" and "nature and sophistication of processing"

criteria and argues that "in its comments to Commerce, CPZ commented only on the level of

investment and COM."  Def.'s Reply 20-23.  The court is not persuaded that it should affirm the

country of origin finding in the Remand Redetermination, in whole or in part, by invoking the

doctrine of exhaustion of administrative remedies.

Whether, and how, to invoke the doctrine of exhaustion in trade cases is a matter for this

Court's discretion.  *See Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007).

Here, the court's remand order expressly required Commerce to reconsider the country of origin

decision in the entirety and to ensure that all associated findings are supported by substantial

record evidence.  *Peer Bearing Company-Changshan*, 35 CIT at __, 804 F. Supp. 2d at 1342,

1356.  Further, reviewing the country of origin decision necessarily requires the court to review

the reasoning by which Commerce reached its findings, including the ultimate finding of country

of origin, and that reasoning consists of the analysis Commerce conducted under the criteria of

its "substantial transformation" and "totality of the circumstances" test.  Thus, the court

considers it necessary and appropriate to analyze fully whether Commerce has adhered to the

court's directive, regardless of whether plaintiff commented to the Department on the application

of particular criteria in that test.  For the reasons stated above, the court concludes that

Commerce has not complied with the court's general directive and issues a second remand order

to address the deficiencies in the Remand Redetermination.  Plaintiff's comments to the

Department did not waive its broader argument that the Remand Redetermination failed to

comply with the court's remand order.  In light of these circumstances, the court, in its

discretion, decides not to affirm the country of origin finding in the Remand Redetermination,

either in whole or in part, based on the doctrine of exhaustion of administrative remedies.

### III.  CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court affirms in part, and rejects in part,

the Remand Redetermination.  Accordingly, upon consideration of *Final Results of*

*Redetermination Pursuant to Court Remand* (Apr. 11, 2012), ECF No. 107, the comments of the

parties thereon, and all papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the Remand Redetermination submitted by the International Trade
Administration, U.S. Department of Commerce ("Commerce") on April 11, 2012, be, and hereby
is, sustained in part and remanded to Commerce in part in accordance with this Opinion and
Order; it is further

**ORDERED** that the Remand Redetermination be, and hereby is, sustained with respect
to Commerce's redetermination of the surrogate values for the consumption of bearing-quality
steel bar and steel wire rod by Peer Bearing Company-Changshan ("CPZ"); it is further

**ORDERED** that Commerce shall submit to the court a second Remand Redetermination
in which it redetermines, in accordance with the requirements of this Opinion and Order, the
country of origin of certain tapered roller bearings ("TRBs") that underwent further processing in

Thailand consisting of grinding and honing (finishing) of cups and cones, and assembly; it is further

      **ORDERED** that Commerce shall submit its second Remand Redetermination within forty-five (45) days of the issuance of this Opinion and Order; it is further

      **ORDERED** that CPZ and The Timken Company ("Timken") shall have thirty (30) days from defendant's filing of the second Remand Redetermination to file any comments thereon; and it is further

      **ORDERED** that defendant shall have fifteen (15) days from the filing of CPZ's or Timken's comments, whichever is later, in which to file any response to such comments.


                    /s/ Timothy C. Stanceu
                    Timothy C. Stanceu
                    Judge

Dated: June 6, 2013
      New York, New York