Slip Op. 15- 142

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PEER BEARING COMPANY - CHANGSHAN,** | |
| Plaintiff, | |
| v. | **Before: Timothy C. Stanceu, Chief Judge** |
| **UNITED STATES,** | **Consol. Court No. 10-00013** |
| Defendant, | |
| and | |
| **THE TIMKEN COMPANY**, | |
| Defendant-intervenor. | |

## <u>OPINION</u>

[Affirming a remand redetermination issued by the International Trade Administration, U.S. Department of Commerce, in litigation arising from an administrative review of an antidumping duty order on tapered roller bearings and parts thereof from China]

Dated: December 21, 2015

*John M. Gurley* and *Diana Dimitriuc Quaia*, Arent Fox LLP, of Washington, DC, argued for plaintiff.

*L. Misha Preheim*, Senior Trial Counsel, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With them on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, and *Jeanne E. Davidson*, Director. Of counsel on the brief was *Joanna V. Theiss*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*William A. Fennell* and *Terence P. Stewart*, Stewart and Stewart, of Washington, DC, argued for defendant-intervenor. With them on the brief was *Stephanie M. Bell*.

Stanceu, Chief Judge: This consolidated action concerns challenges to a final

determination ("Final Results") that the International Trade Administration, U.S. Department of

Commerce ("Commerce" or the "Department") issued to conclude the twenty-first review of an

antidumping duty order (the "Order") on tapered roller bearings ("TRBs") and parts thereof,

finished and unfinished, from the People's Republic of China ("China" or the "PRC"). *Tapered*

*Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of*

*China: Final Results of the 2007-2008 Admin. Review of the Antidumping Duty Order*, 75 Fed.

Reg. 844 (Int'l Trade Admin. Jan. 6, 2010) ("*Final Results*").[1]  The twenty-first review pertained

to entries of subject merchandise made during the period of June 1, 2007 through May 31, 2008

("period of review" or "POR").  *Final Results*, 75 Fed. Reg. at 844.

Before the court is the second redetermination upon remand ("Second Remand

Redetermination") Commerce submitted in response to the court's opinion and order in *Peer*

*Bearing Company-Changshan v. United States*, 37 CIT __, 914 F. Supp. 2d 1343 (2013) ("*Peer*

*Bearing II*").  *Final Results of Redetermination Pursuant to Court Remand* (Apr. 30, 2014), ECF

No. 139 ("*Second Remand Redetermination*").  The Second Remand Redetermination addresses

the only issue remaining in this litigation, which pertains to the issue of whether certain TRBs

produced in Thailand from Chinese-origin parts are subject to the Order.  For the reasons

presented herein, the court affirms the Department's Second Remand Redetermination.

## I. BACKGROUND

The detailed background of this case is provided in the court's prior opinions in this

action and is supplemented herein.  *See Peer Bearing Company-Changshan v. United States*,

---

[1] The scope language of the relevant order reads: "tapered roller bearings and parts
thereof, finished and unfinished, from the PRC; flange, take up cartridge, and hanger units
incorporating tapered roller bearings; and tapered roller housings (except pillow blocks)
incorporating tapered rollers, with or without spindles, whether or not for automotive use."
*Tapered Roller Bearings and Parts Thereof, Finished & Unfinished, from the People's Republic
of China: Final Results of the 2007-2008 Admin. Review of the Antidumping Duty Order*, 75 Fed.
Reg. 844, 845 (Int'l Trade Admin. Jan. 6, 2010).

35 CIT __, __, 804 F. Supp. 2d 1337, 1340-41 (2011) ("*Peer Bearing I*") (first remand order);

*Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1346-47 (second remand order); *Peer Bearing*

*Company-Changshan v. United States*, 37 CIT __, __, Slip Op. 14-15 at 1 (Feb. 13, 2014),

("*Peer Bearing III*") (responding to defendant's motion to clarify the second remand order).

Plaintiff Peer Bearing Company-Changshan ("CPZ"), a Chinese producer and exporter of

TRBs and a respondent in the twenty-first review, initiated this action to contest, *inter alia*, the

Department's determination in the Final Results that certain TRBs that were produced in, and

exported from, Thailand were of Chinese origin for antidumping purposes and therefore were

merchandise subject to the Order.  Compl. (Jan. 20, 2010), ECF No. 2.  Defendant-intervenor

The Timken Company ("Timken"), a domestic TRB producer and petitioner in the twenty-first

review, initiated a separate action contesting the Final Results that is now consolidated into the

above-captioned matter.[2]  *See* Compl. (Mar. 5, 2010), ECF No. 11 (Court No. 10-00045); Order

(May 24, 2010), ECF No. 27 (consolidating cases).

In *Peer Bearing II*, the court affirmed in part, and remanded in part, the remand

redetermination Commerce submitted in response to *Peer Bearing I*, which again determined

that the TRBs at issue were subject merchandise.[3]  *Peer Bearing II*, 37 CIT at __, 914 F. Supp.

2d at 1357.  On June 13, 2013, defendant moved for clarification of the court's order in *Peer*

---

[2] Consolidated under Consolidated Court Number 10-00013 is *The Timken Co. v. United States* (Court No. 10-00045).  Order (May 24, 2010), ECF No. 25 (consolidating cases).  The plaintiff in that action, The Timken Company ("Timken") challenged only one aspect of the final determination, which is no longer in dispute.  *See Peer Bearing Company-Changshan v. United States*, 37 CIT __, __, 914 F. Supp. 2d 1343, 1357 (2013) ("*Peer Bearing II*").

[3] In *Peer Bearing  Company-Changshan v. United States*, 35 CIT __, 804 F. Supp. 2d 1337 (2011) ("*Peer Bearing I*"), the court issued a remand on three issues, including the country-of-origin issue.  In *Peer Bearing II*, the court affirmed the Department's remand redetermination as to all remaining issues except the country-of-origin issue.  *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1357.

*Bearing II*.  Def.'s Mot. for Clarification, ECF No. 131 ("Def.'s Mot.").  The court responded to

defendant's motion on February 13, 2014, the substance of which is addressed later in this

Opinion.  *Peer Bearing III*, 37 CIT __, Slip Op. 14-15.

Commerce filed its Second Remand Redetermination with the court on April 29, 2014.

*Second Remand Redetermination* 1, determining under protest that the TRBs in question were

not subject merchandise.  CPZ and Timken filed comments on the Second Remand

Redetermination on May 30, 2014, and June 9, 2014, respectively.  Pl.'s Comments on the

Second Remand Redetermination, ECF No. 141 ("CPZ's Comments");The Timken Co.'s

Comments on the Dept. of Commerce's Second Remand Redetermination, ECF No. 151

("Timken's Comments").  Timken opposes the Department's revised country-of-origin

determination on various grounds.  *See* Timken's Comments 2-15.  CPZ supports the

Department's determination on second remand.  CPZ's Comments 1-2.  Defendant replied to

Timken's opposition on July 16, 2014.  Def.'s Response to Def.-intervenor's Comments

Regarding the Remand Redetermination, ECF No. 158 ("Def.'s Reply").

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section

516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including an action contesting

the final results of an administrative review that Commerce issues under section 751 of the Tariff

Act, 19 U.S.C. § 1675(a).[4]  The court will sustain the Department's redetermination if it

---

[4] All statutory citations to the Tariff Act of 1930 are to the 2006 edition of the United
States Code and all regulatory citations are to the 2010 edition of the Code of Federal
Regulations.

complies with the court's remand order, is supported by substantial evidence on the record, and

is otherwise in accordance with law.  *See* Tariff Act, § 516A, 19 U.S.C. § 1516a(b)(1)(B)(i).

### B.  The Court Affirms the Second Remand Redetermination

This issue arose from the Department's application of what it termed a "substantial

transformation" test to determine whether the Order included TRBs resulting from

manufacturing processes conducted in a "third country," i.e., a country other than the United

States or the country named in the antidumping duty order.  In the twenty-first administrative

review, Commerce determined that the TRBs remaining at issue in this case were subject to the

Order as products of China.  Before the agency, and again before the court, CPZ claimed that

Commerce erred in subjecting these TRBs to the Order.

### 1.  The Merchandise Remaining at Issue

Before Commerce, CPZ submitted information on the manufacturing processes

performed on its TRBs during the POR.  CPZ reported that in its Chinese facilities it produced

finished TRBs, finished TRB components (cages and rollers), and unfinished TRB components

(cups and cones).  *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1350.  The TRBs that are the

subject of CPZ's claim underwent manufacturing operations conducted in Thailand by a CPZ

affiliate.  In China, CPZ forged, turned (i.e., machined), and heat-treated cups and cones but did

not process these components into a finished form.  In Thailand, CPZ's affiliate completed the

processing of the cups and cones by performing additional machining, i.e., grinding and honing

to achieve the required final dimensions and polished surface.  *Id*.  The Thai affiliate then

assembled the finished cups and cones, together with finished rollers and cages that CPZ had

manufactured in China and exported to Thailand, to produce completed TRBs that were exported

to the United States.  *Id*.

2.  The Department's Method of Determining that the TRBs Were Subject to the Order in the Final Results

Commerce discussed its application of its "substantial transformation" test in the Issues and Decisions Memorandum ("Decision Memorandum") accompanying the Final Results. Issues & Decision Mem., A-570-601, ARP 07-08, at 6-11 (Dec. 28, 2009) (Admin.R.Doc. No. 5701) *available at* http://enforcement.trade.gov/frn/summary/PRC/E9-31417-1.pdf (last visited Dec. 16, 2015) ("*Decision Mem.*").  For the first part of its test, Commerce considered the record evidence according to six criteria, drawing a conclusion under each as to whether the record supports or detracts from a finding that a substantial transformation had occurred in Thailand.  *Id.*  The Department's six criteria were: (1) whether the processed downstream product is of a different class or kind than the upstream product; (2) the extent to which the physical and chemical properties, and the essential character of the TRBs, were imparted in the third country, i.e., Thailand; (3) the nature and sophistication of the Thai processing operations; (4) the level of investment in the Thai operations; (5) ultimate use; and (6) the third country cost of manufacturing ("COM") as a percentage of the total COM.  *Id.*  For the second part of its test, Commerce evaluated these criterion-specific determinations collectively and made an ultimate finding on substantial transformation according to the "totality of the circumstances."  *Id.*

For the Final Results, Commerce concluded that the record evidence did not support a finding that a substantial transformation occurred in Thailand under any of its six criteria and that, based on the totality of the circumstances, the TRBs were subject to the Order.  *Id.* Consequently, Commerce included the TRBs in CPZ's U.S. sales, which Commerce compared with matching normal value transactions to calculate CPZ's weighted-average dumping margin in the Final Results.  *Id.*

3.  The Court's Decision in *Peer Bearing I* and the First Remand Redetermination

Upon judicial review of CPZ's claim, the court concluded in *Peer Bearing I* that a

remand was appropriate because "Commerce based its country-of-origin determination in part on

[a] . . . finding [that] is not supported by substantial evidence on the record," specifically, the

"finding that 'the third country processor's costs as compared to each product's COM are not

significant.'" *Peer Bearing I*, 35 CIT at __, 804 F. Supp. 2d at 1342 (citation and footnote

omitted).  In support of its determination, the court cited evidence on the record that "the

processing costs in Thailand accounted for 42% of the total cost of manufacturing."  *Id.*

(citations omitted).  Considering the Department's invalid factual finding sufficient to require a

remand, the court ordered Commerce to "reconsider on the whole its determination of the

country of origin of the bearings that underwent further processing in Thailand," instructing

Commerce "to ensure that its redetermination . . . is based on findings supported by substantial

evidence on the record of this case."  *Id*.

In the First Remand Redetermination, Commerce again concluded that the TRBs at issue

were subject to the Order, applying its substantial transformation test according to the same six

criteria it had used in the Final Results.  *Final Results of Redetermination Pursuant to Court

Remand* 8-17 (Apr. 10, 2012), ECF No. 107 ("*First Remand Redetermination*").  Commerce

modified the finding it had made in the Decision Memorandum under its sixth criterion

(third-country COM as a percentage of total COM).  First, it performed its own calculation of the

total COM incurred in both China and Thailand, incorporating its revised surrogate values for

production operations conducted in China.  *Id*. at 27.  Based on this figure, Commerce calculated

that the COM incurred in Thailand accounted for 38% of the total COM.  *Id.*; *see* Def.'s Resp. to

the Court's Order (Aug. 19, 2015), ECF No. 168 (withdrawing claim to confidentiality regarding

the revised Chinese and Thai cost of manufacturing percentages calculated in the First Remand

Redetermination).  Commerce described this as a "meaningful figure" that "could be one part of

an analysis that finds substantial transformation when considered in the context of other factors

that also support a finding that substantial transformation occurs in the third country."  *Id*.

at 27-28.  However, Commerce qualified this conclusion by stating that under its substantial

transformation test "no single factor is dispositive" and that the COM in Thailand was "not so

significant as to outweigh the other factors which the Department must take into account."  *Id*.

at 16.  As to those "other factors," Commerce concluded that its analysis of record evidence

under its other five criteria did not support a finding that a substantial transformation occurred in

Thailand.  *Id*. at 8-17.  Consequently, Commerce again determined that the record evidence did

not support an ultimate finding that the TRBs were substantially transformed in Thailand and

again placed the TRBs at issue within the scope of the Order.  *Id.* at 23.

    4.  The Court's Decision in *Peer Bearing II* and the Second Remand Redetermination

      In *Peer Bearing II*, the court again remanded the Department's decision for

reconsideration.  The court held that "[o]n remand, Commerce must reach a new country of

origin determination because the record in this case lacks substantial evidence to support the

Department's current determination that the TRBs processed in Thailand were products of China

for purposes of the antidumping duty order."  *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d

at 1356.  Pointing to the record and to statements Commerce made in the First Remand

Redetermination, the court continued:

> [Commerce] acknowledges, and the record confirms, that the cups and cones
> (which, irrefutably, are the two major components of each TRB) were exported to
> Thailand in unfinished form, . . . that the grinding and honing operations
> performed on the cups and cones in Thailand, in the Department's own words,
> "serve an important role in the production of a bearing," . . . that all assembly
> operations took place in Thailand, . . . and that the percentage of the cost of
> manufacturing that was incurred in Thailand, in the Department's words, was
> "meaningful" and "could be part of an analysis that finds in favor of substantial
> transformation . . . ."

*Id.* (citations omitted).  The court concluded that, "[i]n reaching its determination,

Commerce impermissibly relied on certain critical findings of fact that . . . were not

supported by substantial evidence on the record and that, in some cases, were reached

without consideration of probative evidence to the contrary."  *Id.*  Defendant

subsequently moved for clarification, asking whether the court's order in *Peer Bearing II*

"requires Commerce to find that the TRBs were substantially transformed in Thailand

and are thus of Thai origin, or whether the order permits Commerce to make new

findings under each of the six criteria and make a determination based on these new

findings."  Def's Mot. for Clarification 2 (June 13, 2013), ECF No. 131 (emphasis

omitted).  The court declined to modify the substance of its previous ruling.  *Peer

Bearing III*, 37 CIT at __, Slip Op. 14-15 at 2.  The court explained that the opinion in

*Peer Bearing II* "did not reach the question of whether Commerce, in the second remand

redetermination, is required to arrive at an ultimate finding that the TRBs in question are

of Thai origin" and instead "left it to Commerce to decide, in the first instance, whether it

is possible to reach an ultimate finding of Chinese origin in the second remand

redetermination."  *Id*. at __, Slip Op. 14-15 at 4.  The court added, however, that "[s]uch

an ultimate finding . . . would have to contend with record evidence to the contrary and

recognize the significance of the court's having disallowed" as unsupported by

substantial evidence "a number of findings that were critical to the country of origin

determination."  *Id*.  The court also stated in *Peer Bearing III* that, contrary to certain

assumptions underlying defendant's motion for clarification, *Peer Bearing II* had not

actually affirmed all of the criteria in the Department's substantial transformation

analysis.  *Id.* at __, Slip Op. 14-15 at 5.

In the Second Remand Redetermination, Commerce excluded from the Order the TRBs at issue in this case and, as a result, reduced CPZ's weighted-average dumping margin from 7.37% to 6.24%. *Second Remand Redetermination* 2. Commerce stated that "we now determine the TRBs to be of Thai-origin" because the second redetermination "must necessarily be in accordance with the Court's directives" in *Peer Bearing II*, in which the court "disallowed a number of findings that were critical to our previous finding that the merchandise in question is of Chinese origin." *Id*. at 1-2. Commerce stated in the Second Remand Redetermination that it "is respectfully conducting this remand under protest." *Id*. at 2 (footnote omitted). In the Second Remand Redetermination, Commerce again applied its "substantial transformation" criteria but modified them in light of the court's decision in *Peer Bearing II* and, in particular, the findings the court found to be unsupported by substantial evidence on the record.

Commerce did not apply its first criterion, "class or kind/scope," in the Second Remand Redetermination, stating that "[i]n compliance with the Court's holding that it did not affirm the use of this criterion and found that it has no apparent relevance, we have not applied, nor given weight to, this criterion." *Second Remand Redetermination* 7. In *Peer Bearing II*, the court questioned the relevance of the class or kind/scope criterion and the Department's conclusion thereunder in the First Remand Redetermination that the presence within the scope of parts of TRBs suggested that a substantial transformation did not occur in Thailand. *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1352. The court concluded that Commerce had failed to provide reasons why this criterion was relevant to the issue before Commerce. *Id.* at __, 914 F. Supp. 2d at 1351-52. The court reasoned, further, that "[t]o resolve that issue according to a 'substantial transformation' analysis, Commerce must decide whether the Chinese-origin parts, finished and unfinished, were substantially transformed by the processing in Thailand that converted these parts into finished TRBs." *Id.* at __, 914 F. Supp. 2d at 1352. The court further

reasoned that "[t]he Remand Redetermination not only reaches a conclusion unsupported by

reasoning but also errs in misstating the issue, framing it as one of whether *TRBs*, as opposed to

the finished and unfinished parts, are 'substantially transformed in Thailand.'" *Id.* (citing *First

Remand Redetermination* 8).

It appears that Commerce considered itself bound by *Peer Bearing II* to dispense with its

first criterion entirely. *Peer Bearing II*, however, did not prohibit Commerce from applying its

class or kind/scope criterion, although it held that Commerce had failed to explain the relevance

this criterion could have for the inquiry at issue and saw error in the way Commerce applied that

criterion in the First Remand Redetermination. In the current remand redetermination,

Commerce chose not to apply the criterion rather than give reasons why it considered it relevant.

That was the Department's choice, and Commerce errs to the extent that it implies that the court

disallowed any application of the first criterion. Commerce noted that in response to its motion

for clarification, in which Commerce asked whether on remand it should reapply its six criteria,

the court responded that it had not actually approved the criteria. But the court did not

disapprove the criteria or any criterion *per se*; instead it rejected, in some instances, the ways in

which certain of the criteria had been applied.

*Peer Bearing II* affirmed some, and rejected some, of the factual findings Commerce

reached under its second criterion, "physical/chemical properties and essential character." The

court rejected as unsupported by substantial record evidence the Department's ultimate findings

that the processes performed in Thailand on the cups and cones imparted no substantial changes

to the physical or mechanical properties or the essential character of the merchandise that would

constitute a substantial transformation of the merchandise. *Peer Bearing II*, 37 CIT at __, 914 F.

Supp. 2d at 1353. The court reasoned that the "merchandise" consisted of finished TRBs and

that as shown by record evidence, a TRB is designed and built to perform load-bearing and

friction-reducing functions in the machine to which it is fitted.  *Id.* at __, 914 F. Supp. 2d

at 1352.  The court further reasoned that the evidence did not demonstrate (and Commerce did

not actually find) that any single part exported from China to Thailand possessed the physical

properties, mechanical properties, or essential character of a complete TRB.  *Id.*  The court noted

that "[t]he record evidence will not permit a finding that any part produced in China had the

mechanical or physical properties characterizing a finished TRB, which were acquired only

following the finishing and assembly processes."  *Id.* at __, 914 F. Supp. 2d at 1353.  As stated in

*Peer Bearing II*, "because no single part made in China possessed the essential character of a

TRB, the Department's finding that the essential character of the finished TRBs was imparted in

China, as opposed to Thailand, is a logical impossibility."  *Id.* at __, 914 F. Supp. 2d at 1352-53.

       In the Second Remand Redetermination, Commerce stated that "because the Court held

that 'no single part made in China possessed the essential character of a TRB,' we conclude that

we have no alternative but to find that the physical properties and essential character criterion

supports a finding that the TRBs are substantially transformed in Thailand."  *Second Remand*

*Redetermination* 9 (citing *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1352).

       *Peer Bearing II* found unsupported by substantial record evidence a finding Commerce

made in the First Remand Redetermination under its third criterion, "nature/sophistication of

processing," which was that "the nature, extent and sophistication of the Thai processing

were . . . not significant."  *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1353 (citing *First*

*Remand Redetermination* 24).  The court observed that Commerce itself had described the

machine processes conducted in Thailand as serving an important role in the production of a

bearing and were comprised of "a series of steps wherein the width, the outside diameter, and

bore of the rings (cup and cone) are ground and the inside diameter of the outer ring and the

outside diameter of the inner ring are polished."  *Id.* (citing *First Remand Redetermination* 11

(footnote omitted)).  The court noted, further, that the Thai processing included multiple stages of assembly operations.  *Id*.  In the Second Remand Redetermination, Commerce decided, due to the court's having rejected its finding, that "we find that we are left with no option but to conclude that the nature and sophistication of Thai processing is significant (or, at least, not insignificant) and, as such, that this criterion supports a finding that the TRBs are substantially transformed in Thailand."  *Second Remand Redetermination* 11.

In the Second Remand Redetermination, Commerce explained that in the Final Results it had determined that it had insufficient information on the record to reach a conclusion under its fourth criterion, "level of investment."  *Id*.  Although Commerce never reopened the record to obtain additional information, it reversed this determination in the First Remand Redetermination and concluded that this criterion "does not weigh in favor of finding substantial transformation." *First Remand Redetermination* 27.  Acknowledging that it lacked quantitative data on levels of investment in China and Thailand, Commerce nevertheless proceeded to apply its criterion according to what it termed "qualitative" information on the types of production equipment used in each country.  *Id*. at 24.  Commerce concluded that "the level of investment in Thailand is not significant in comparison to the level of investment in the PRC because the Thai production stages require significantly less machinery, and less sophisticated machinery[,] than the PRC production stages."  *Id*. at 27 (footnote omitted).  In *Peer Bearing II*, the court stated that "[w]hether or not supporting the Department's general characterization regarding how 'sophisticated' the machinery was, the record does not support the finding of 'significantly less machinery' in Thailand for a reason Commerce admits: the record lacked quantitative data." *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1354.  The court added that, by the Department's own admission, Commerce had no quantitative threshold for what qualifies as a "significant" level of investment.  *Id*.  That Commerce was able to show from record evidence

that the processing in China required relatively more types of production equipment than the

processing in Thailand did not, in the court's view, support a finding that the investment in

Thailand was not "significant."  Pointing to record evidence that the machining in Thailand

required multiple stages and that all assembly operations occurred in Thailand, *Peer Bearing II*

held that with such evidence present on the record, "the record as a whole cannot support the

finding that the investment in production equipment in Thailand was not 'significant,' either by

itself or in comparison with the investment in China."  *Id*.

　　Because the court had disallowed the finding on which Commerce had concluded that the

"level of investment" criterion supported its decision to place the TRBs at issue within the scope

of the Order, Commerce concluded in the Second Remand Redetermination that "we are left

with no alternative but to conclude that the level of investment in Thailand is significant (or, at

least, not insignificant) and that this criterion supports a finding that the TRBs are substantially

transformed in Thailand."  *Second Remand Redetermination* 14.

　　Under its fifth criterion, "ultimate use," Commerce found in the First Remand

Redetermination that "[t]he fact that the scope of the *Order* includes TRBs and parts thereof

(cups, cones, rollers, cages, *etc*.), finished and unfinished, indicates that both finished and

unfinished TRBs are intended for the same ultimate end-use, that is, a finished TRB that can

ultimately be used in a downstream product."  *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d

at 1355 (quoting *First Remand Redetermination* 14 (emphasis in original)).  *Peer Bearing II*

identified an obvious flaw in this analysis: the issue presented by the case did not involve

"unfinished TRBs" and instead was whether TRBs produced in Thailand from unfinished and

finished, Chinese-origin parts should be considered merchandise subject to the Order.[5]  The court

also held erroneous the Department's stated finding that "the expected use of the unfinished TRB

components is the same use as that of finished TRBs."  *Id*. (quoting *First Remand*

*Redetermination* 14).  The court concluded that the finding, as stated by Commerce, was

contradicted by the record evidence, which demonstrated that the only "expected" use of the

unfinished cups and cones could have been the production of finished cups and cones, which in

turn could be used only in the assembly of finished TRBs in Thailand.  *Id*.  Finally, the court in

*dicta* noted the narrowness of the "ultimate use" criterion, in the application of which

"Commerce appears to give little or no consideration to the record fact that the two major TRB

components, the cups and cones, were not suitable for use in the assembly process in the form in

which they were exported to Thailand."  *Id*. (citing *First Remand Redetermination* 6-7, 41).

   The Second Remand Redetermination states that "[t]hus, the court found that it did not

sustain the Department's use of this criterion, and held that the intended use of a TRB part is for

use in a finished TRB, which is not the same end use as a TRB." *Second Remand*

*Redetermination* 15.  This formulation misinterprets the court's holding by attributing to the

court a finding the court did not make.  As discussed in *Peer Bearing II* and summarized in this

opinion, the court found fault with the Department's basing its ultimate use analysis on

"unfinished TRBs," which are not at issue in this case, and pointed out errors in the findings

upon which Commerce relied, exactly as those findings were stated in the First Remand

Redetermination.  Commerce responded to the court's decision on the application of the

"ultimate use" criterion by dispensing with the criterion altogether.  Commerce added that

---

[5] The court also identified an error of logic, pointing out that the issue of the end use of a good is an issue of fact, not a question dependent on whether parts are included in an antidumping duty order.  *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1355.

"[t]hus, in compliance with the Court's holding, we have not relied upon this criterion in our analysis and do not find that it supports a finding that the TRBs are not substantially transformed in Thailand." *Id.*  This characterization also misinterprets the court's holding.  The court did not hold that Commerce was precluded from applying its "ultimate use" criterion and instead pointed out the errors that occurred in the way Commerce applied it in the First Remand Redetermination.  In developing the Second Remand Redetermination, Commerce was free to consider the fact that the merchandise exported from China to Thailand consisted entirely of parts of TRBs, finished and unfinished, rather than materials that could have had multiple uses. Indeed, the fact that all of the exported parts had no "ultimate use" other than in the manufacturing of a finished TRB is undisputed in this case and obvious from the record evidence.

In applying its final criterion, third country COM (i.e., cost of manufacturing) as a percentage of total COM in the Second Remand Redetermination, Commerce again relied on its calculation that 38% of the total COM had been incurred in Thailand.  Commerce stated therein that "we continue to find that the COM of Thai processing is meaningful on its own, although not more significant than the COM of PRC processing," and that "[h]owever, as a result of our revised findings on the other five criteria, we find that this criterion supports a finding that the TRBs are substantially transformed in Thailand in conjunction with the findings on the other prongs of the analysis." *Second Remand Redetermination* 17.

Commerce stated its ultimate conclusion that "the totality of the circumstances demonstrates that the TRBs which are further processed in Thailand are substantially transformed in Thailand and are thus of Thai origin." *Id.*  Commerce explained that it had reached this conclusion based on the relative COM of Thai processing and its analysis under the other three criteria which it had applied, having excluded two criteria (i.e., class or kind/scope

and ultimate use).  *Id*.  As the court has discussed, the decision to exclude those two criteria (as opposed to correcting the analyses thereunder) was made by Commerce, not by the court.

    5.  The Court Affirms the Department's Determination that the TRBs at Issue are Outside the Scope of the Antidumping Duty Order

The court affirms the Second Remand Redetermination because it is based on a reasonable, rather than expansive, construction of the scope of the Order and because the ultimate finding that the bearings at issue are not within the scope of the Order is supported by substantial evidence on the administrative record.

The application of the Department's substantial transformation analysis to a product that emerged from manufacturing operations conducted in a third country has been the subject of other recent litigation before this Court.  *See Peer Bearing Co.-Changshan v. United States*, 38 CIT __, 986 F. Supp. 2d 1389 (2014) ("*Peer Bearing 11-22*"); *Bell Supply Company, LLC v. United States*, 39 CIT __, Slip Op. 15-73 (July 9, 2015) ("*Bell Supply*").[6]

*Peer Bearing 11-22*, which involved the subsequent (twenty-second) administrative review of the Order, addressed the issue of whether Commerce acted lawfully in determining that TRBs produced in substantially the same way as those at issue in the twenty-first review were merchandise subject to the Order.  Like the TRBs at issue in the twenty-first review, the TRBs at issue in *Peer Bearing 11-22* resulted from machining in Thailand that converted

---

[6] Challenged in *Bell Supply* was a final scope ruling in which Commerce concluded that an antidumping duty order on finished and unfinished oil country tubular goods ("OCTGs") from China included OCTGs resulting from heat treatment and processing in Indonesia that were performed on unfinished OCTGs (including "green tubes") exported to Indonesia from China. *Bell Supply Co. LLC v. United States*, 39 CIT __, __, Slip Op. 15-73 at 2-3 (July 9, 2015) ("*Bell Supply*").  The Court of International Trade concluded in *Bell Supply* that Commerce erred in resolving its scope inquiry because it failed to interpret the scope language of the antidumping and countervailing duty orders, did not address the effect of 19 U.S.C. § 1677j(b), and did not apply its regulation, 19 C.F.R. § 351.225(k), having first cited the regulation only to abandon an application of the regulation in favor of a substantial transformation analysis. *Id.*

unfinished cups and cones to finished, ready-for-assembly cups and cones and from assembly in

Thailand using finished, Chinese-origin cages and rollers.  In *Peer Bearing 11-22*, this Court

rejected the Department's determination on remand that these TRBs were subject merchandise.

*Peer Bearing 11-22* began its analysis by examining the scope language of the Order.

The opinion stated that "[t]he imported bearings at issue were not, in any literal or ordinary

sense, 'imports of tapered roller bearings from the PRC' as described in the scope language of

the Order" because "[i]t was in Thailand, not China, that the imported merchandise became

'tapered roller bearings.'"  *Peer Bearing 11-22*, 38 CIT at __, 986 F. Supp. 2d at 1400 (citation

omitted).  The opinion then noted the general principle that Commerce may construe, but may

not modify, the scope of an existing antidumping duty order.  *See Peer Bearing 11-22*, 38 CIT

at __, 986 F. Supp. 2d at 1397.  Citing appellate decisions, the opinion viewed the Department's

authority under 19 U.S.C. § 1677j(a)-(d) as an exception to this general principle, under which

Commerce, in certain circumstances, is empowered to enlarge the scope of an order to reach

products not covered by the existing scope.  *Id.* at __, 986 F. Supp. 2d at 1398 (citing *AMS

Assoc. v. United States*, 737 F.3d 1338, 1343 (Fed. Cir. 2013) ("*AMS Assoc.*"); *Duferco Steel,

Inc. v. United States*, 296 F.3d 1087, 1098 (Fed. Cir. 2002) ("*Duferco*")).  *Peer Bearing 11-22*

concluded that the statute, in 19 U.S.C. § 1677j(b)(1)(A) and (B), "specifically addresses the

situation in which a good imported into the United States is completed or assembled in a 'third

country,' i.e., a country other than the country named in the order."  *Id.*  The *Peer Bearing 11-22*

opinion stated that the scope language of the Order, which Commerce must construe reasonably,

not expansively, and the statutory language of 19 U.S.C. § 1677j(b)(1)(A) and (B) "cast doubt on

the Department's decision."  *Id.* at __, 986 F. Supp. 2d at 1400.

*Peer Bearing 11-22* acknowledged that legislative histories of the versions of § 1677j(b)

enacted in 1988 and 1994 "do not state explicitly that Congress intended by enacting these

provisions to limit the authority of Commerce in construing the scope of an existing order in any

situation in which third country completion or assembly is at issue." *Id.* at __, 986 F. Supp. 2d

at 1402.  The opinion reasoned, nevertheless, that the statutory language and legislative histories

show that "Congress considered it necessary to grant Commerce additional authority so that

Commerce could address these situations by expanding, rather than merely interpreting, the

scope of an existing antidumping or countervailing duty order" and that "Congress could not

have done so without possessing a general understanding that a good emerging from a third

country completion or assembly operation such as that described in 19 U.S.C. § 1677j(b)(1)(A)

and (B) ordinarily would not be considered to be within the scope of the order in question, at

least where, as here, the commercial identity of the finished good was acquired in the third

country." *Id.* (footnote omitted).  Identifying specific limitations that Congress placed on the

anticircumvention authority of 19 U.S.C. § 1677j(b)(1)(A) and (B), *Peer Bearing 11-22*

concluded that "the way in which Congress provided anticircumvention authority in

19 U.S.C. § 1677j(b) is an indication that Commerce exceeded the limitations on its authority to

interpret, without enlarging, the scope of the Order when it placed within that scope the TRBs

exported from Thailand." *Id.*  The court added that "[h]ere, Commerce placed within the Order a

product of a type Congress contemplated would be the subject of an anticircumvention inquiry,

without actually conducting such an inquiry." *Id.* at __, 986 F. Supp. 2d at 1402-03.  *Peer*

*Bearing 11-22* further reasoned as follows:

> Had Commerce chosen to conduct an anticircumvention inquiry under 19 U.S.C.
> § 1677j(b), it could not have placed the TRBs in question within the order without
> meeting all three of the criteria Congress set forth in 19 U.S.C. § 1677j(b)(1)(C)-
> (E).  The criterion in paragraph (C) is that "the process of assembly or completion
> in the foreign country . . . is *minor* or *insignificant* . . ."  On the record of the
> twenty-second review, it is far from certain that this criterion could have been
> met.

> One obstacle to satisfying the paragraph (C) criterion is that the "process of assembly or completion" conducted in Thailand was more than mere assembly or completion. As Commerce itself found, the cup and cone machining process in Thailand involved "a series of steps wherein the width, the outside diameter, and bore of the rings (cup and cone) are ground and the inside diameter of the outer ring and the outside diameter of the inner ring are polished."

*Peer Bearing 11-22*, 38 CIT at __, 986 F. Supp. 2d at 1403 (citations omitted). Opining that the result of any anticircumvention inquiry Commerce could have conducted under § 1677j(b) "would have been far from certain," *Peer Bearing 11-22* summarized its reasoning by stating that "[o]n this administrative record, the court cannot at the same time conclude that Commerce had the discretion to place these TRBs under the Order by relying solely on its interpretive authority, which necessarily is narrower than the anticircumvention authority provided by § 1677j(b)." *Id.* at __, 986 F. Supp. 2d at 1405 (citing *Duferco*, 296 F.3d at 1098).

The court did not apply in *Peer Bearing II* the same analysis it later applied to the results of the twenty-second review in *Peer Bearing 11-22*. In *Peer Bearing II*, a remand was required because certain findings of fact were not supported by substantial record evidence and because these findings were critical to the Department's ultimate finding that the TRBs exported from Thailand that were at issue in the twenty-first review were subject to the Order. Nevertheless, certain principles discussed in *Peer Bearing 11-22* are also applicable to this case and support the conclusion that the Second Remand Redetermination must be affirmed. In this case as well as in *Peer Bearing 11-22*, Commerce has not invoked the anticircumvention authority provided by 19 U.S.C. § 1677j(b), and had it attempted to do so, it would have had to address the fact that the manufacturing operations in Thailand involved both completion of the cups and cones *and* assembly. *See* 19 U.S.C. § 1677j(b) (providing for invocation of the anticircumvention authority where "the process of assembly *or* completion in the foreign country . . . is *minor or insignificant*" (emphasis added)). Absent reliance on the anticircumvention authority,

Commerce unquestionably must construe reasonably, rather than expansively, the scope

language of the Order.  *See AMS Assoc.*, 737 F.3d at 1343; *Duferco*, 296 F.3d at 1098.

       The class or kind of merchandise identified as subject merchandise by the scope language

falls into four distinct categories: finished TRBs from the PRC, unfinished TRBs from the PRC,

finished parts of TRBs from the PRC, and unfinished parts of TRBs from the PRC.  *See Final*

*Results*, 75 Fed. Reg. at 845.  The scope language does not identify a fifth category consisting of

TRBs that are produced in a third country from unfinished and finished parts from the PRC.

Here, the TRBs at issue did not *become* TRBs in China: what was produced and exported from

China to Thailand consisted solely of parts of TRBs, finished and unfinished, and no such part

plausibly could be described as an unfinished TRB.  Considered on the whole, the record

evidence supports the ultimate finding that TRBs produced in this way are not within the scope

of the Order when the scope language is construed reasonably and not expansively.

       For example, a critical finding by Commerce in the Second Remand Redetermination is

that "[t]he production in Thailand consists of grinding and polishing, which refine the finished

measurements and smoothness of the cup and cone components in line with tolerance levels, and

assembly."  *Second Remand Redetermination* 8.  Further, Commerce reiterated its earlier

findings that the grinding and polishing of the cups and cones in Thailand served an important

role in the production of a bearing.  *Id*.  As this finding indicates, it is undisputed that CPZ

exported to Thailand unfinished cups and cones and finished cages and rollers.  Commerce did

not find, and on this record could not permissibly have found, that what was exported from

China to Thailand were unfinished TRBs.  Moreover, because the cups and cones were not

exported to Thailand in a form ready for assembly, Commerce could not permissibly have found

(and did not find) that what was exported to Thailand constituted unassembled TRBs.  Because

the ultimate finding that the TRBs exported from Thailand are not within the scope of the Order

is supported by substantial evidence and conforms to a reasonable, rather than expansive, interpretation of the scope language of the Order, the Second Remand Redetermination qualifies for affirmance.

In opposing the Second Remand Redetermination, Timken takes issue with a conclusion the court reached in *Peer Bearing II*: that Commerce erred in finding that the finishing processes performed in Thailand on the cups and cones imparted no substantial changes to the physical and mechanical properties or the essential character of the merchandise that would constitute a substantial transformation of the merchandise.  Timken's Comments 4-5 (citing *Peer Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1352).  Timken submits that "[u]nder the Court's logic, an automobile imported without its wheels could not be characterized as having the essential characteristics of an automobile because it is incapable of movement."  *Id*. at 5.

The flaw in Timken's argument is apparent from the analogy Timken offers.  An automobile imported without its wheels necessarily would have the "essential character" of an automobile (and would be recognized as such for tariff purposes) because it is in fact an unfinished automobile, not an automobile part.  But in this case, Commerce was not faced with a factual record under which unfinished TRBs were exported from China to Thailand.  It cannot seriously be contended that an unfinished cup or cone, or a cage or a roller, has the functional or mechanical characteristics of a tapered roller bearing.

Timken next argues that "[e]ven if the Court does not accept Timken's argument, it should reject the Department's conclusion" that "because the Court ruled that no single imported part has the character of a finished TRB, its consideration of these characteristics require [*sic*] a conclusion that TRBs are substantially transformed in Thailand."  *Id*.  Timken adds that "[i]t is not possible to discern, as a Court must, the logical connection between facts found and a conclusion drawn."  *Id*. (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168

(1962)).  The court finds no merit in this argument.  As discussed above, the court can discern

from the Second Remand Redetermination factual findings, supported by substantial evidence,

that are sufficient to support the ultimate finding that the TRBs at issue are not "imports of

tapered roller bearings from the PRC" within the meaning of the Order.  Timken's argument is

further flawed in misconstruing the question Commerce was required to decide.  That question

was not, as Timken's argument posits, whether "TRBs are substantially transformed in

Thailand."  According to the Department's own findings, Thailand was the *only* country in which

the TRBs at issue—as opposed to the unfinished cups, unfinished cones, and finished cages and

rollers—can be said to have been produced.  If the question were required to be stated in terms of

"substantial transformation," that question could only be whether the Chinese-origin parts, i.e.,

the unfinished cups, the unfinished cones, and the finished cages and rollers, underwent a

substantial transformation during the manufacturing operations in Thailand by which they were

converted into finished TRBs.

　　　　Timken directs its next argument to the Department's application of its

"nature/sophistication of processing" criterion and, specifically, to the Department's reversing in

the Second Remand Redetermination its finding in the First Remand Redetermination that the

nature, extent, and sophistication of the Thai processing were not significant.  Commerce

reversed this finding in response to *Peer Bearing II*, which concluded that the finding was not

supported by substantial evidence on the record.  *Second Remand Redetermination* 11; *see Peer*

*Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1353.  Noting in the Second Remand

Redetermination that the court had mentioned its reversal of the finding in the response to

defendant's motion for clarification, Commerce stated as follows:

　　　. . . [B]ecause the Court held that the record does not support a finding that the
　　　nature and sophistication of Thai processing is not significant, we find that we are
　　　left with no option but to conclude that the nature and sophistication of Thai

processing is significant (or, at least, not insignificant) and, as such, that this criterion supports a finding that the TRBs are substantially transformed in Thailand.

*Second Remand Redetermination* 11.  Timken argues that the above-quoted conclusion was "illogical and unsupported by the record."  Timken's Comments 7.  Timken acknowledges in its comment submission that the finding rejected by the court "may not, as this Court found, be supported by the record" but argues that the Department's original finding was different, was supported by substantial evidence, and was not rejected by the court.  *Id*. at 8.  Regarding the original finding, Timken notes that Commerce found in the Final Results that:

> . . . [T]he finishing processing in and of itself is not significant enough to be considered a process that substantially transforms the subject merchandise for antidumping purposes, because there is no substantial change to the primary properties of the merchandise other than slight alterations to the shape of the TRB through the finish grinding process and a smoothing of the TRB's cup and cone raceways through the honing process.

*Id*. (quoting *Decision Mem.* 8).  According to Timken, Commerce acted illogically and contrary to the record evidence because "[a] broad finding that there is not sufficient evidence for the Department to affirmatively conclude that processing was not significant does not lead to the conclusion that therefore it must have been significant and so support a finding of substantial transformation."  *Id*. at 7.  Adding that "[t]he Court's negative does not prove the Department's positive" and that "the Department has in this analysis again failed to meet its obligation to investigate and to draw logical conclusions from the facts it has found," Timken asks the court "to reject the Department's remand conclusion as unsupported by substantial evidence."  *Id*. at 7-9.

Timken's argument is unpersuasive because the Second Remand Redetermination clearly is supported by substantial evidence.  The manufacturing operations conducted in Thailand, although not as extensive as those conducted in China, cannot be characterized truthfully as "not

significant."  These operations involved more than assembly of finished cups and cones made to

the precise tolerances that were required for use in TRBs.  As the Department's own discussion

impliedly recognized, these operations were essential to the conversion of the Chinese-origin

parts, unfinished and finished, into TRBs.

Timken makes a similar argument pertaining to the Department's "level of investment"

criterion.  In *Peer Bearing II*, the court rejected the Department's finding that "based on the

types of equipment required for the production stages in the PRC versus the type of equipment

required for the finishing and assembly processing occurring in Thailand, the investment in the

Thai equipment is *not significant* in comparison to the investment in the PRC equipment."  *Peer*

*Bearing II*, 37 CIT at __, 914 F. Supp. 2d at 1354 (quoting *First Remand Redetermination* 14

(emphasis added)).  The court noted that "[a]s the [First] Remand Redetermination

acknowledges, the record not only lacked quantitative data but included evidence that the cups

and cones underwent multiple stages of processing in Thailand requiring 'an investment for

machinery' and evidence that all assembly operations for the TRBs at issue took place in

Thailand."  *Id*. (citing *First Remand Redetermination* 12-14, 25-27).  The court concluded that

"[b]ecause such evidence is present, the record as a whole cannot support the finding that the

investment in production equipment in Thailand was not 'significant,' either by itself or in

comparison with the investment in China."  *Id*.  In the Second Remand Redetermination,

Commerce reasoned as follows:

> As discussed above, in *[Peer Bearing] II*, the Court held that, because there is
> record evidence that the multiple stages of grinding and subsequent assembly that
> occur in Thailand required an "investment for machinery," the record cannot
> support a finding that the Thai level of investment is insignificant.  Thus, we find
> that we are left with no alternative but to conclude that the level of investment in
> Thailand is significant (or at least, not insignificant) and that this criterion
> supports a finding that the TRBs are substantially transformed in Thailand.

*Second Remand Redetermination* 13-14.  Timken argues, here as well, that "the Court's negative

does not prove the Department's positive," adding that "[t]he Department's transformation of

missing information into an affirmative finding of substantial transformation does not establish a

logical connection between the facts found and the conclusions drawn, nor can it reasonably be

characterized as 'a judgment anchored in the language and spirit of the relevant statutes and

regulations.'"  Timken's Comments 10 (quoting *Freeport Minerals Co. v. United States*,

776 F.2d 1029, 1032 (Fed. Cir. 1985) and citing *Burlington Truck Lines, Inc. v. United States*,

371 U.S. 156, 168 (1962)).  Contrary to this argument, the court is able to discern the

Department's reasoning.  The court has no valid basis to conclude that the finding that the TRBs

at issue are outside of the scope of the Order is contrary to statute or regulations.

Timken's final argument is that Commerce's calculation of the relative COM in

Thailand, 38%, is overstated.  Timken submits that Commerce improperly included factory

overhead associated with the raw materials received from China in its calculation of Thai

manufacturing costs.  Timken's Comments 12-15.  Timken argues that "[b]y including Thai

overhead attributable to Chinese inputs in its build-up of Thai costs, Commerce has added a

second factory overhead amount to the same inputs," so that, "in effect, there is double-

counting."  Timken's Comments 14.

Before the court, Timken presents an alternative COM calculation that it proposed during

the second remand proceeding and that Commerce rejected in the Second Remand

Redetermination.  Timken's Comments 4, 13, *see also Second Remand Redetermination* 18-31.

Timken questions the Department's use of certain factory overhead data supplied by CPZ and

accuses Commerce of incorrectly including in the calculation of the Thai COM "factory

overhead attributable to Chinese inputs."  Timken's Comments 13.  Timken argues that the

Department's calculation of 38% for the relative COM in Thailand is overstated because it

"attribute[s] Thai overhead to products [i.e., parts] created in China so that, in effect, there is double-counting*." Id*. at 14.  Timken's proposed recalculation modifies the Department's calculation by using a substitute Thai COM that is based on "the labor amount plus the factory overhead attributable to that labor." *Id*. at 13.  Timken's proposed recalculation would reduce the calculated Thai COM percentage by more than half. *Id*.

During the second remand proceeding, Commerce disagreed with Timken's recalculation on various grounds, including the ground that "Timken fails to provide any analysis or cite to any record evidence to demonstrate that CPZ improperly reported or allocated its overhead costs." *Second Remand Redetermination* 24.  According to Commerce, "the allocated overhead costs reconcile to the Thai facility's financial reporting, and Timken provides no evidence to the contrary." *Id*. at 25.

Commerce also informed the court in the Second Remand Redetermination that even if it were to accept Timken's reduced calculation of the Thai COM (which, for various stated reasons, it did not), it still would reach the same ultimate decision. *Second Remand Redetermination* 31 (" . . . we do not find that the considerably less 'substantial' . . . percent value-added cited by Timken to be a compellingly insignificant percentage of COM to overcome our revised findings on the remaining criteria.").

The court agrees with Commerce that Timken has failed to demonstrate with record evidence that the Department's calculation of the relative percentage COM for the Thai operations was erroneously calculated or otherwise invalid.  As Commerce points out, "there is nothing on record to demonstrate that relatively high overhead costs (compared to labor costs) are anything but a normal reflection of the Thai facility's financial reality in its first months of operation." *Second Remand Redetermination* 25.  Moreover, even if this 38% value-added calculation were disregarded, the record still would contain substantial evidence to support the

ultimate determination that the TRBs at issue are not "imports of TRBs from the PRC."  As the

court has discussed, and Commerce has found, the machining in Thailand conducted upon the

two major components, the cups and the cones, required stages of processing to achieve the

required dimensional tolerances and finish.  It is undisputed that the assembly operations

required to produce the actual TRBs also took place in Thailand.  Commerce did not find, and on

this record could not validly have found, that CPZ's operations in Thailand were limited to

completion of unfinished or unassembled bearings.  Even were the court to accept, *arguendo*,

Timken's COM analysis, the record evidence still would be sufficient to demonstrate that the

manufacturing operations conducted in Thailand, during which the merchandise acquired its

commercial identity as TRBs, were not of a sort that fairly could be characterized as

insignificant.

      Because this case involves interpretation of scope language in an antidumping duty order,

the court next considers whether Commerce was required by its own regulation, 19 C.F.R.

§ 351.225(k), to consider the factors set forth in paragraph (k)(1) and, if those factors are not

dispositive, the factors in paragraph (k)(2).  An argument can be made that before excluding the

merchandise at issue from the scope of the Order, Commerce first should have followed the

sequence of factors set forth in paragraphs (k)(1) and (k)(2).  Under such an argument, the court

should order a remand so that Commerce, with the comment of the parties, may consider this

issue.  The court is aware of uncertainty over whether Commerce currently interprets this

regulation to apply to scope issues involving the country of origin.  *See Bell Supply*,

39 CIT at __, Slip Op. 15-73 at 11 (explaining that in a scope ruling Commerce invoked

§ 351.225(k) but then "shifted its inquiry to a substantial transformation analysis.").  On its face,

the regulation does not contain an exception or exclusion for scope questions involving country

of origin.  On the other hand, Commerce addressed the scope issue in this case in the context of

an administrative review, not a separate scope inquiry, which raises another interpretive question

as to the regulation.  As discussed below, the court need not decide the question of whether the

regulation applied in the circumstance presented by this case.

Under the analysis set forth by the Court of Appeals in *Duferco*, 296 F.3d at 1098,

Commerce may include merchandise within an order only if the language of the order expressly

includes that merchandise or can reasonably be interpreted to include it.  The court concludes

that in the Second Remand Redetermination, Commerce would not have been required to

consider the factors in subsection (k) even were it presumed that the regulation applied in the

circumstance presented.  Here, as the court has emphasized, Commerce must apply a reasonable,

and not an expansive, interpretation of the scope.  In the Final Results and the First Remand

Redetermination, Commerce reached out to place within the scope TRBs that emerged from, and

acquired their commercial identity as "TRBs" from, manufacturing operations conducted in a

third country rather than the country named in the Order.  The Order makes no mention of

inclusion of TRBs produced in this way, and a commonsense interpretation of the term "imports

of tapered roller bearings from the PRC" does not suggest that the Order was intended to apply

to such goods.  Therefore, the court concludes that the scope language does not expressly include

the goods at issue in this case.  Because Commerce is required to interpret that language

reasonably and not expansively, and because of the Department's own findings as to the nature

of the merchandise, as supported by substantial record evidence in this case, placing that

merchandise under the Order could not have been accomplished according to a reasonable

construction of the scope language.  Therefore, even were 19 U.S.C. § 351.225 presumed to

apply in this situation, the court would find no error in the Department's reaching its decision in

the Second Remand Redetermination without performing an analysis of the factors in

subsection (k) thereof.

The final issue in this case is whether a third remand is required because Commerce misinterpreted certain aspects of the court's opinion in *Peer Bearing II*.  As discussed above, Commerce erroneously concluded that the court had precluded any application of the Department's first criterion (class or kind/scope) and fifth criterion (end use).  Nevertheless, the court determines that another remand is unnecessary and would serve no valid purpose. Commerce could have, but did not, attempted to demonstrate the relevance of its first criterion. And even if this criterion is accorded "relevance," any analysis thereunder must confront the plain, uncontested fact that the merchandise at issue, as imported into the United States from Thailand, consisted of finished TRBs, not finished or unfinished TRB parts.  Expressed in terms of "substantial transformation," the issue is whether the manufacturing operations performed in Thailand resulted in a substantial transformation of the finished and unfinished parts that were exported to Thailand from China, and not whether "TRBs" (finished or unfinished) were substantially transformed.  Similarly, the result of the Department's "end use" criterion is not irrelevant, and the court did not so hold in *Peer Bearing II*.  As discussed previously in this opinion, Commerce was not precluded from taking into consideration the uncontested fact that the TRB production in Thailand was conducted upon parts, finished and unfinished, that ultimately were destined to become TRBs.  In short, the errors Commerce made in construing the court's opinion in *Peer Bearing II* do not prevent the court from affirming the Second Remand Redetermination by applying the standard of review, under which the court subjects the Department's findings to a substantial evidence standard and considers, further, whether the Second Remand Redetermination is otherwise in accordance with law.  In performing this review, the court concludes that Commerce reached an ultimate determination that is supported by substantial evidence on that record and that accords with a reasonable, rather than expansive, interpretation of the scope of the Order.

### III. Conclusion

For the reasons discussed in the foregoing, the court concludes that the Second Remand

Redetermination qualifies for affirmance upon judicial review.  Judgment will enter accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: December 21, 2015
          New York, New York